FRITO-LAY, INC., Petitioner-Respondent,

v.

WISCONSIN LABOR & INDUSTRY REVIEW COMMISSION,
Respondent,

James Lyons, Appellant†

Court of Appeals

*No. 79–238. Submitted on briefs October 12, 1979.—
Decided February 18, 1980.*
(Also reported in 290 N.W.2d 551.)

† Petition to review granted. ABRAHAMSON, J., took no part.

For the appellant the cause was submitted on the briefs of *Bruce F. Ehlke* and *Lawton & Cates* of Madison.

For the petitioner-respondent the cause was submitted on the brief of *James T. Murray, Jr.* and *Borgelt, Powell, Peterson & Frauen, S.C.* of Milwaukee.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

GARTZKE, P.J. Complainant, James R. Lyons, has appealed from the order of the circuit court which set aside the order of the Wisconsin Labor and Industry Review Commission. The commission concluded that the respondent, Frito-Lay, discriminated against complainant because of his physical handicap in violation of the Wisconsin Fair Employment Act, sec. 111.31 *et seq.*, Stats. 1973, and ordered that he be reinstated as an employee.[1]

---

[1] Section 111.325, Stats. 1973, provides that it is unlawful for any employer to discriminate against any employee. Section 111.32, Stats. 1973, provides in material part:

(5) (a) "Discrimination" means discrimination because of . . . handicap . . . by an employer . . . against any employe . . . in

The commission found that complainant was employed by Frito-Lay at its Beloit, Wisconsin plant for almost five years until he was discharged. He had no chargeable accidents in that period. He worked as a truck driver at the Beloit plant during that period and drove trucks for over thirteen years before he began work for Frito-Lay. He has had a regular Wisconsin driver's license and a chauffeur's license for over twenty years, both of which were granted after he passed a sight examination, in spite of amblyopia (lazy eye) in his left eye. Frito-Lay laid him off in October 1975 pending a status check on his eye condition. Two opthalmologists who examined complainant indicated that he was fully capable of continuing to drive a truck.

Frito-Lay discharged complainant October 31, 1975 because his eye condition did not meet the physical qualifications of the United States Department of Transportation (DOT) for truck drivers in interstate commerce.[2]

---

regard to his hire, tenure or term, condition or privilege of employment . . . .

. . . .

(f) The prohibition against discrimination because of handicap does not apply to failure of an employer to employ or to retain as an employe any person who because of a handicap is physically or otherwise unable to efficiently perform, at the standards set by the employer, the duties required in that job. . . .

[2] The effect of the DOT's regulation, 49 C.F.R. sec. 391.41(b)(10), is to prevent a person from driving a truck for a motor carrier in interstate commerce (with exceptions not pertinent) unless the person, "Has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses . . . ." Complainant has only 20/200 visual acuity in his left eye and the condition cannot be corrected.

Frito-Lay attempted to extricate itself and complainant from the conflict between state and federal regulations. Frito-Lay requested a waiver of the DOT's visual acuity requirements. The DOT's Bureau of Motor Carrier Safety denied the request in December 1975. Its letter enclosed a position paper which states that the bureau "has completed a recent research effort to reevaluate the

The commission found that Frito-Lay's Beloit plant had interstate and intrastate truck runs and a system by which drivers determined their runs through seniority bidding. All drivers senior to complainant agreed to leave daily intrastate runs to him and to give him the "spotter" position in Beloit, which would allow him to stay inside Wisconsin.

The commission found that complainant was able safely and efficiently to perform the job duties of a truck driver on intrastate runs at the employer's standards and concluded that Frito-Lay discriminated against complainant because of his handicap.

The circuit court held that Frito-Lay and its drivers at the Beloit plant were engaged in interstate commerce and that the DOT physical qualifications must be met by every driver. The court held that even if Frito-Lay created a run wholly within Wisconsin for complainant, he would nevertheless be delivering goods in the stream of interstate commerce. The court therefore set aside the commission's order.

The unchallenged facts upon which the circuit court relied as are follows: The Beloit plant is both a manufacturing facility and a shipping terminal. It does not produce a complete line of Frito-Lay snack foods. Additional products are shipped to the Beloit plant from plants located outside Wisconsin. The products received from outside plants are not repackaged and are delivered with products produced in Beloit. All products are delivered by truck from Beloit to retailers in Wisconsin, Minnesota, Michigan, Iowa and Illinois. Wisconsin retailers receive about thirty-eight percent of the deliveries from Beloit. Under ten percent of the products manufactured by out-of-state plants are delivered by Beloit drivers directly to retailers without being reloaded onto trucks

current visual and auditory requirements for drivers to safely operate a commercial motor vehicle. The results of this study fail to support any relaxation of our present visual requirements."

with Beloit products. Few products received from plants located outside Wisconsin remain at the Beloit warehouse longer than three days.

We note that orders are received at the Beloit plant and are filled from the products in the warehouse as well as from products manufactured at the plant. The record is silent as to whether the shipments from out-of-state origins to Beloit are made to fill preexisting orders from retailers, except for loads that are direct shipments to specific locations. The latter constitute less than ten percent of all loads handled by Beloit drivers.

■

Agency findings and orders under the Wisconsin Fair Employment Act are subject to review under ch. 227, Stats. Sec. 111.37, Stats. 1973. The scope of our review is the same as that of the circuit court under sec. 227.20. *Sanitary Transfer & Landfill, Inc. v. DNR*, 85 Wis.2d 1, 12, 270 N.W.2d 144 (1978). Questions of law decided by the agency are judicially reviewable under sec. 227.20 (5). *Pabst v. Department of Taxation*, 19 Wis.2d 313, 322, 120 N.W.2d 77 (1963). The application of a statute to a particular set of facts is a question of law. *Bucyrus-Erie Co. v. ILHR Department*, 90 Wis.2d 408, 417, 280 N.W.2d 142 (1979), and cases cited.

■

Where the material facts are not in dispute and the only question is one of law, the court may substitute its judgment for that of the agency. *Wis. Bingo Sup. & Equip. Co. v. Bingo Control Bd.*, 88 Wis.2d 293, 308, 276 N.W.2d 716 (1979); *Hall Chevrolet Co., Inc. v. Dept. of Revenue*, 81 Wis.2d 477, 483, 260 N.W.2d 706 (1978).

As the commission found that the employer discriminated against the complainant, the burden is upon Frito-Lay to show that its actions were exempt under the Wisconsin Fair Employment Act or otherwise. *Chicago, M.,*

*St. P. & P. R.R. Co. v. ILHR Dept.*, 62 Wis.2d 392, 215 N.W.2d 443 (1974).

The issue on appeal is whether Frito-Lay has shown that complainant must meet the physical qualifications established by the DOT for persons who drive motor vehicles for motor carriers.

The DOT's requirements, if applicable, prevail over lesser requirements established by the state. Frito-Lay is a private carrier of property by motor vehicle, as defined in sec. 203 (a) (17) of Interstate Commerce Act—Part II [49 U.S.C. sec. 303 (a) (17)]. Part II of the Interstate Commerce Act is also known as the Motor Carrier Act. Congress provided by sec. 204 (a) (3) of the Motor Carrier Act [49 U.S.C. sec. 304 (a) (3)] that the Interstate Commerce Commission may prescribe qualifications for employees of private motor carriers and transferred that power in 1975 to the Secretary of Transportation. 49 U.S.C. sec. 1655 (e) (6) (C). The DOT has established minimum qualifications for persons who drive motor vehicles for motor carriers. 49 C.F.R. sec. 391.1 *et seq.*[3]

Congress "adopted a comprehensive plan for regulating the carriage of goods by motor truck in interstate commerce. The federal plan of control was so all-embracing that former power of states over interstate motor carriers was greatly reduced." *Castle v. Hayes Freight Lines*, 348 U.S. 61, 63 (1954). The regulations establishing minimum qualifications for interstate drivers do not prevent a state from prescribing additional qualifications which are "not inconsistent or in conflict with" those regulations. *Buck v. California*, 343 U.S. 99, 101–02 (1952). The visual acuity requirements of this

[3] A private carrier of property is a "motor carrier" for purposes of enforcement of safety regulations. *See* sec. 204 (a) (3) and (c) of the Motor Carrier Act [49 U.S.C. sec. 304(a)(3) and (c)].

state for truck drivers are less than and are inconsistent with the DOT's regulations.

Frito-Lay is therefore subject to the DOT driver qualifications if Frito-Lay is subject to the Motor Carrier Act.

The circuit court concluded that movements from the Beloit plant were in interstate commerce and that Frito-Lay was therefore subject to the Act, primarily on the basis of *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943). The issue in *Walling* was whether employees at branch warehouses at which interstate shipments of merchandise were received were "engaged in commerce" within the meaning of the Fair Labor Standards Act, 52 Stats. 1060, c. 676 [29 U.S.C. sec. 201 *et seq.*].

*Walling* is not controlling because it did not involve the Interstate Commerce Act. "There is no single concept of interstate commerce which can be applied to every federal statute regulating commerce." *McLeod v. Threlkeld*, 319 U.S. 491, 495 (1943). Construction of every statute regulating "interstate commerce" presents "a unique problem in which words derive vitality from the aim and nature of the specific legislation." *Federal Trade Commission v. Bunte Bros.*, 312 U.S. 349, 351 (1941).

As pointed out in *Tucker v. Casualty Reciprocal Exchange*, 40 F. Supp. 383 (N.D. Ga. 1941), "the [Interstate Commerce] Act does not purport to regulate all acts and matters indirectly related to interstate transportation by motor carriers." The question before this Court is whether the transportation at issue was in interstate or foreign commerce within the meaning . . . of the Interstate Commerce Act . . . *Southern Pac. Transp. Co. v. I.C.C.*, 565 F.2d 615, 617 (9th Cir. 1977).

We must determine whether Frito-Lay showed that all of its truck movements from Beloit are in interstate commerce, as defined by the Motor Carrier Act. Section 203(a) of the Act [49 U.S.C. sec. 303(a)] provides that as used in the relevant part of the Act: "(10)

The term 'interstate commerce' means commerce between any place in a State and any place in another State or between places in the same State through another State . . . ."

The record includes the details of truck runs routed by Frito-Lay from Beloit during twenty-two days in August and September 1976. So far as we can determine, during that period Frito-Lay had 647 truck runs, 163 of which involved only Wisconsin destinations.

The record therefore contains substantial evidence for the finding by the commission that Frito-Lay had intrastate runs from its Beloit plant, so far as that finding is one of fact. Frito-Lay contends, however, that the runs from Beloit to Wisconsin retailers are nevertheless in interstate commerce because they closely follow the interstate movements to the warehouse.

Transportation wholly between points within a single state, even if immediately subsequent to transportation by another carrier from a point in another state, is not necessarily interstate commerce subject to economic regulation by the Interstate Commerce Commission. Thus, that commission concluded that for-hire motor transportation, between points within a single state, of property which has moved from, or will move to points beyond that state in private motor carriage, is, so far as the for-hire transportation is concerned, not in interstate commerce subject to economic regulation under the Motor Carrier Act. *Motor Transportation of Property Within A Single State,* 94 M.C.C. 541 (1964), *aff'd. sub. nom. Pennsylvania Railroad Co. v. United States,* 242 F. Supp. 890 (E.D. Pa. 1965), *aff'd. per curiam,* 382 U.S. 372 (1966), 384 U.S. 914 (1966).

We look for guidance to the decisions of the Interstate Commerce Commission because it is charged with the administration of the Motor Carrier Act. *See* sec. 204 of the Act [49 U.S.C. sec. 304]. An interpretation by that commission of the Act is entitled to great weight.

*United States v. American Trucking Associations,* 310 U.S. 534, 549 (1940). The same is true of interpretations by the DOT of sec. 204(a)(3). No decisions by either agency determining the nature of interstate commerce, for purposes of sec. 204(a)(3), have been brought to our attention.

In the absence of a ruling by the Interstate Commerce Commission or the DOT to the contrary, we assume that "interstate commerce" means the same, whether the issue is jurisdiction to prescribe driver qualifications for private motor carriers under sec. 204 (a)(3) of the Act or jurisdiction to issue operating authorities to for-hire carriers under secs. 206 and 209 of the Motor Carrier Act. [49 U.S.C. secs. 306 and 309].

The Interstate Commerce Commission considered the problem of determining the character of motor carrier transportation between points in a single state from a distribution point supplied by shipments from another state in *Petroleum Products Transported Within A Single State,* 71 M.C.C. 17 (1957). The commission noted the landmark decision in *Atlantic Coast Line R. Co. v. Standard Oil Co.,* 275 U.S. 257, 268 (1927), which involved the character of movements from a distribution point to points in the same state and where it is said:

> The question whether commerce is interstate or intrastate must be determined by the essential character of the commerce, and not by mere billing or forms of contract, although that may be one of a group of circumstances tending to show such character. The reshipment of an interstate or foreign shipment does not necessarily establish a continuity of movement or prevent the shipment to a point within the same state from having an independent or intrastate character . . . .

Relying in part upon its precedents involving the transportation of commodities which had a prior movement

in interstate commerce to a warehouse, the commission stated that in determining the essential character of the movement from the distribution point, "the factor most often relied on is the fixed and persisting transportation intent of the shipper at the time of shipment." 71 M.C.C. 17, 27, 29. The Interstate Commerce Commission concluded:

As applied to the type of traffic here involved, the major manifestations of this intent, or the absence thereof, may be found in the following: (1) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, (2) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (3) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage. These things, it is believed, are basically sufficient to establish that the continuity of transportation has been broken, that the initial shipments have come to rest, and that the interstate journey has ceased. 71 M.C.C. 17, 29.

■ The truck runs from the Beloit plant involving deliveries exclusively in Wisconsin have not been shown to be in interstate commerce under the three-part test established by the Interstate Commerce Commission. Frito-Lay offered no evidence that the out-of-state products received at the Beloit plant were shipped to that plant pursuant to specific orders for specific quantities to be moved through to a specific destination in Wisconsin.[4] The first part of the test to establish the con-

---

[4] We cannot determine whether the direct shipments to specific destinations which we understand were handled by Beloit drivers and constitute less than ten percent of all loads handled by those drivers, moved to the plant for unloading or moved directly to the destination without unloading. If those loads are in inter-

tinuity of transportation for interstate commerce has not been met. The truck shipments from the plant are arranged after orders are received at the Beloit plant which are filled from the products that are in the Beloit warehouse as well as products manufactured at Beloit. The Beloit distribution manager testified that the loads are made up on the basis of those orders. The commission could have found a break in the continuity of transportation under the second and third parts of the test.

Frito-Lay relies upon *Beggs v. Kroger Co.,* 167 F.2d 700 (8th Cir. 1948), and *Shew v. Southland Corporation (Cabell's Dairy Div.),* 370 F.2d 376 (5th Cir. 1966), as authority that the truck runs from Beloit to Wisconsin retailers are in interstate commerce. Neither citation is apposite. In *Beggs* a company maintained a warehouse and company-owned stores in Arkansas. The company knew when out-of-state shipments to the warehouse began that the shipments were destined to its retail stores. None of the goods that entered the warehouses were resold. *Beggs* held that the warehouse "was merely a convenient instrumentality for the division of the shipments coming to it and the continuation of the movement of each part to the retail stores." 167 F.2d 700, 703. The facts in *Shew* are similar to those in *Beggs.* The distribution point in *Shew* was supplied by out-of-state shipments made pursuant to preexisting orders from branches of the company which owned the distribution facility. 370 F.2d 376, 378, 380. Here the Beloit plant functions as a warehouse to serve customers, not company-owned outlets.

The question remains whether Frito-Lay has shown that all its drivers must comply with DOT physical qualifications because Frito-Lay has interstate truck runs, even if it also has intrastate runs.

---

state commerce, the fact remains that they constitute a small portion of the runs handled by Beloit drivers.

Substantial evidence exists for the commission's finding that Frito-Lay's Beloit plant had interstate runs, so far as that finding is factual. So far as we can determine, during the twenty-two day period in 1976, Frito-Lay had 484 runs which included a delivery outside Wisconsin. Some out-of-state product is delivered by Beloit drivers directly to retailers. As those truck shipments cross a state line, they are interstate commerce as defined by sec. 203 (a) of the Motor Carrier Act.

If a motor carrier operates in interstate and intrastate commerce and all its drivers handle or may be assigned to handle interstate and intrastate traffic, then the Interstate Commerce Commission (now the DOT) has the power to establish driver qualifications for all the carrier's drivers pursuant to sec. 204 of the Motor Carrier Act. *Morris v. McComb,* 332 U.S. 422, 432–34 (1947).

If, however, the carrier operates in interstate and intrastate commerce but certain of its drivers handle only intrastate traffic, then the Interstate Commerce Commission does not have the power to establish qualifications as to those drivers. *Goldberg v. Faber Industries, Inc.,* 291 F.2d 232 (7th Cir. 1961). The Interstate Commerce Commission in its brief amicus curiae agreed in *Goldberg* that it had no power or jurisdiction over the intrastate drivers. 291 F.2d 232, 235.

Frito-Lay determines the points at which deliveries will be made on each truck run. Frito-Lay does not assign drivers to truck runs. The drivers assign themselves through seniority bidding and those senior to complainant have agreed to give him intrastate runs. As Frito-Lay has not shown that all its runs from Beloit to Wisconsin points are in interstate commerce, the

visual acuity qualifications established by the DOT for truck drivers have not been shown to apply to complainant if he handles runs from Beloit exclusively to Wisconsin points.

The duties of the "spotter" position have not been detailed in the record. It may be that position, which apparently involves movements wholly within the yard of the plant, is also exempt under 49 C.F.R. sec. 391.2 (a), which relates to movements wholly within a municipality or the commercial zone thereof as defined by the Interstate Commerce Commission, as provided in 49 C.F.R. sec. 390.16. If driving as a "spotter" is in fact exempt from 49 C.F.R. sec. 391.1 et seq., then it would appear that complainant may fill that position without meeting the minimum driver qualifications established by the DOT.

We conclude that Frito-Lay has failed to show that its discriminatory action against complainant is exempt under the Wisconsin Fair Employment Act or otherwise.

By the Court.—The order of the circuit court is reversed and vacated.