OPINION OF THE COURT
Bertram Katz, J.
In this matter arising out of a collision between a tractor *789 trailer and a passenger car on the Cross-Bronx Expressway in 1983, the defendant Fruehauf Corp., a manufacturer and designer of tractor trailer bumpers, contends that the safe design of such bumpers is an area wholly reserved to and preempted by Federal regulations, and that jurors in State tort cases may not set a standard of care that differs from the Federal standard. For the reasons that follow, this court finds that there is no preemption, and that the plaintiffs action sounding in strict products liability should be allowed to proceed to trial.
In this motion for summary judgment, Fruehauf Corporation (Fruehauf) has moved to dismiss all causes of action and all cross claims against it. The plaintiff, Peter Garcia, was injured on January 12, 1983 when the 1975 Oldsmobile that he was riding in collided with the left rear and side of a 1978 Fruehauf refrigerated van trailer. Mr. Garcia was sitting in the front passenger seat, an area which took the brunt of the collision, in that the rear of the trailer overrode the front hood of the Oldsmobile, and invaded the right front of the passenger compartment. Among other things, the plaintiff sustained fractures of the skull, blindness of the right eye, a fractured right femur, and disfigurement. The driver of the Oldsmobile was defendant Kirwin Rivera, and the owner was defendant Ines M. Rivera. The Fruehauf vehicle was owned by defendant Barry T. Fox, Jr., and driven by defendant Oliver M. Sherwood, Jr.
The trailer was purportedly equipped with a 62-inch-wide steel rear bumper, which was shaped like an inverted Greek letter pi, and was located approximately 28 to 30 inches above street level. The rear of the trailer was 96 inches wide, leaving 17 inches between each side of the trailer and the ends of the bumper. Fruehauf alleges that the specifications of this bumper, which is called an "ICC bumper”, comply in all respects with the pertinent Federal design regulation, 49 CFR 393.86, a provision of the Federal Motor Carrier Safety Regulations (FMCSR).
The gist of plaintiffs negligent design claim in this case as against Fruehauf is that the ICC bumper should have been designed to extend the full width of the trailer, and should have had sufficient mass and strength to prevent the Oldsmobile from underriding the rear of the trailer. It is also contended that alternative bumper designs have existed since at least 1969 which prevent "vehicle underride” of the type which occurred here, but that tractor trailer manufacturers *790 including Fruehauf have acted out of financial self-interest in successfully pressuring Congress to abstain from enacting more stringent standards of bumper design.
For its part, Fruehauf asserts that its ICC bumpers fully comply with 49 CFR 393.86, and that it had no duty to design and manufacture a bumper that exceeded the Federal standard, nor can it be shown that alternative designs might not be more dangerous than the bumpers currently in use. It is further argued that expansion of the duty imposed by the Federal regulations is a matter reserved to the appropriate Federal Legislature bodies, not to a State court jury, that common-law tort claims are both expressly and impliedly preempted by the FMCSR, and that principles of comity and Federalism prevent this court from intruding into an area of pervasive Federal regulation.
As to the plaintiff’s additional claims that the ICC bumper was defectively manufactured, Fruehauf alleges that there is simply no evidence of such a defect in that the bumper is no longer available for examination and the plaintiff must rely on insufficient circumstantial evidence. Fruehauf also contends that plaintiff is unable to make a prima facie showing that the vehicle underride caused enhanced injuries over and above those caused merely by the collision, a prerequisite to recovery against Fruehauf. Finally, it is asserted that plaintiff’s breach of warranty claim against Fruehauf, aside from being superfluous, is barred by the Statute of Limitations, in that tender of delivery of the tractor trailer took place in November 1978, more than four years prior to the commencement of this lawsuit.
The plaintiff and codefendants Fox and Sherwood contend that the Federal regulation may be some evidence of due care on the part of Fruehauf, but that such regulations represent a minimum standard, and that the State courts are not in this context preempted from considering the issues of negligent design or manufacture. Furthermore, defendants Fox and Sherwood contend that even if the plaintiff’s breach of warranty claim is time barred, their analogous cross claims which are governed by a six-year Statute of Limitations are not. Plaintiff also argues that the testimony and other evidence will suffice to establish circumstantially that the ICC bumper was defectively manufactured in that it was not firmly affixed to the trailer and sheared off the trailer upon impact, thereby enhancing plaintiff’s injuries.
*791 Finally, plaintiff has submitted affidavits from two experts who will attempt through their testimony at trial to recreate the accident’s sequence of events, and thereby establish that the alleged defective design of the ICC bumper caused the plaintiff to suffer more drastic or enhanced injuries than would have been suffered in a collision in which underride did not occur.
THE FEDERAL STANDARD
49 CFR 393.86 has a long and controversial history. This regulation first took effect in 1953, and has remained unchanged since that time. It reads as follows:
"393.86 Rear end protection
"Every motor vehicle, except truck-tractors, pole trailers, and vehicles engaged in driveaway-towaway operations, the date of manufacture of which is subsequent to December 31, 1952, which is so constructed that the body or the chassis assembly if without a body has a clearance at the rear end of more than 30 inches from the ground when empty, shall be provided with bumpers or devices serving similar purposes which shall be so constructed and located that: (a) The clearance between the effective bottom of the bumpers or devices and the ground shall not exceed 30 inches with the vehicle empty; (b) the maximum distance between the closest points between bumpers, or devices, if more than one is used, shall not exceed 24 inches; (c) the maximum transverse distance from the widest part of the motor vehicle at the rear to the bumper or device shall not exceed 18 inches; (d) the bumpers or devices shall be located not more than 24 inches forward of the extreme rear of the vehicle; and (e) the bumpers or devices shall be substantially constructed and firmly attached. Motor vehicles constructed and maintained so that the body, chassis, or other parts of the vehicle afford the rear end protection contemplated shall be deemed to be in compliance with this section.”
Rear underride, which occurs when the rear end of the truck is too high off the ground, and there is too little structure underneath to resist the front of the automobile, is a problem which has concerned the Department of Transportation, the trucking industry, and the general public, for many years. It has been implicated in a disproportionate number of highway fatalities and serious personal injuries, resulting in *792 debate and reexamination of the "rear end protection” statute.
One of the major problems confronting designers of tractor trailer bumpers is that ground clearance must be sufficient to permit the trailer’s rear deck to line up with loading docks, most of which are from 48 to 52 inches high. Furthermore, front car bumpers are of varying heights, and front car hoods are of varying lengths, thereby compounding the designer’s difficulties. Other considerations include the fact that heavier bumpers reduce the trailer’s payload and increase fuel costs. It is Fruehaufs position that alternative bumper designs, such as bumpers that extend the full width of the trailer, cause a risk of other types of accidents and are of negligible effect in preventing underride, particularly on a cost-benefit basis.
Nevertheless, it appears that dissatisfaction with the standard imposed in 1953 has been manifested many times, once in 1967, when the National Highway Traffic Safety Administration concluded that "a better regulation was needed because of the continuing problem of fatalities and serious injuries occurring in accidents involving excessive underride, and because of the absence of efforts by the vehicle manufacturer generally to go sufficiently beyond the [Federal] requirement.” (46 Fed Reg 2,137 [1981].)
In 1969, a proposed rule was announced that for some specified vehicles would have changed the minimum 30-inch ground clearance requirement, by requiring the installation of a rear-end protection device set at a maximum 18-inch ground clearance.
However, in 1971, concluding that the safety benefits would not be commensurate with the cost of implementation, a position taken by the trucking industry, the National Highway Traffic Safety Administration (NHTSA) terminated consideration of the proposed standard. At that time, it was concluded that the new rule would save 50 to 100 lives a year at an annual cost to the consumer of $500 million.
Efforts to reform the regulations resumed in 1977 when congressional hearings on underride collisions led to research studies to explore alternative bumper designs. A study conducted by the Texas Transportation Institute of Texas A & M University concluded that rigid guards with lower ground clearance, while preventing underride, nevertheless increased injuries to car occupants by increasing the deceleration forces during a crash. Also tested were energy-absorbing bumpers, *793 and trucks with no rear bumpers at all, but in which the rear axle had been placed at the extreme rear of the trailer. Both methods were found to be effective in preventing underride.
In light of the various test results, in 1981 the NHTSA proposed the installation of rear underride guards with a maximum ground clearance of 55 centimeters (21.65 inches). This level was considered by the agency to adequately address the twin concerns of safety and utility, i.e., at 55 centimeters, the guard would engage the engines of most small cars and prevent underride, and still have sufficient clearance to permit normal trucking operations. These guards were to be continuous across the rear of the vehicle, in order to prevent offset collisions.
Other alternative proposals were considered and rejected, including an energy-absorbing bumper in use throughout Europe, chiefly because of cost, although it was observed that manufacturers were free to use such devices, and were in fact encouraged to do so. Also rejected was a proposal to require the rear wheel assembly to be permanently fixed in the extreme aft position, in spite of the proven rear underride prevention capabilities of this design, simply because such design restricted flexibility and placed an operational burden on the user. Vehicles with such rear axle designs, however, were planned by the NHTSA to be exempted from the new standard.
The cost of installation of rear guards was projected to be $50 per guard, with an added fuel cost at then current prices of $500,000 per year for the entire fleet of 339,000 affected vehicles.
Although slated to become effective on September 1, 1983, the proposed rule was never enacted. 49 CFR 393.86 remains unchanged.
THE PREEMPTION DOCTRINE
It is the position of Fruehauf that the Federal Motor Carrier Safety Regulation in question preempts State law. Two types of preemption have emerged from Federal jurisprudence: express preemption and implied preemption. Express preemption arises when Congress expressly states an intention to preempt in the enabling legislation.
In the absence of express preemption, Federal law has established four factors which must be analyzed in determin *794 ing whether Congress intended to impliedly preempt or occupy a particular field of law:
1) the aim and intent of Congress as revealed by the statute itself and its legislative history;
2) the pervasiveness of the Federal regulatory scheme as authorized and directed by the legislation and as carried into effect by the Federal administrative agency;
3) the nature of the subject matter regulated and whether it is one which demands " 'exclusive Federal regulation in order to achieve uniformity vital to the national interest’ ”, or
4) " 'whether, under the circumstances of [a] particular case [state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’ ” (Northern States Power Co. v State of Minnesota, 447 F2d 1143, 1146-1147 [8th Cir 1971], affd 405 US 1035 [1972].)
In KVUE, Inc. v Austin Broadcasting Corp. (709 F2d 922 [5th Cir 1983], affd sub nom. Texas v KVUE, Inc., 465 US 1092 [1984]) the test of implied preemption was summarized as: (1) whether the area requires national uniformity; (2) whether there is evidence of congressional design to preempt the field; or (3) whether the State law actually and directly conflicts with the Federal.
The court does not find Fruehaufs express preemption argument to be convincing. There is a presumption against preemption in the areas of traditional State power, such as compensation for torts. (Silkwood v Kerr-McGee Corp., 464 US 238 [1984].) Indeed. Fruehauf does not specifically identify any portion of the FMCSR that can reasonably be construed as expressly precluding State court juries from imposing stricter standards than the Federal regulations.
Instead, Fruehauf has made an implied preemption argument, citing by analogy to the numerous cases brought against vehicle manufacturers for failure to install air bags or other passive restraints. In a large number of these cases, the Federal courts have held that a car manufacturer’s compliance with the National Traffic and Motor Vehicle Safety Act, which permits installation of either lap and shoulder belts or air bags, impliedly preempted and barred State judgments for tort liability against said manufacturers. (See, Schick v Chrysler Corp., 675 F Supp 1183; Baird v General Motors Corp., 654 F Supp 28.)
In other cases, implied preemption has not been found. (See, *795 Wood v General Motors Corp., 673 F Supp 1108; Murphy v Nissan Motor Corp., 650 F Supp 922.)
However, analogies have their limitations. What is implicated here is the Motor Carrier Safety Act, the enabling legislation which from its outset has proceeded from an assumption of competing State regulations. For example, in section 206 (c) (2) of the Motor Carrier Safety Act (49 USC, Appendix § 2505 [c] [2]), as amended in 1984, the Secretary was directed before issuing any regulations, to "consider * * * (B) State laws and regulations pertaining to commercial motor vehicle safety in order to minimize unnecessary preemption of such State laws and regulations under this Act.” Furthermore, Congress provided for a method under which State laws and regulations could be reviewed, under a rule-making procedure, for compatability with the Federal act. (49 USC, Appendix §§ 2506, 2507.)
"Unquestionably * * * Congress did not intend to occupy completely the field of safety regulations for the operation on interstate highways of commercial vehicles but also that it contemplated the continued application and enforcement of State rules or regulations which might not be inconsistent or 'incompatible’ with federal regulations. In effect, Congress intended an accommodation with state regulations so long as that could be achieved without violating federal law or valid federal regulation.” (Specialized Carriers & Rigging Assn. v Commonwealth of Virginia, 795 F2d 1152, 1156.)
The regulations reflect this. 49 CFR 390.30 provides that "[e]xcept as otherwise specifically indicated, Parts 390-397 of this subchapter are not intended to preclude States or subdivisions thereof from establishing or enforcing State or local laws relating to safety, the compliance with which would not prevent full compliance with these regulations by the person subject thereto.”
49 CFR 393.2 is particularly apt, stating "Nothing contained in Parts 390-397 of this subchapter shall be construed to prohibit the use of additional equipment and accessories, not inconsistent with or prohibited by Parts 390-397 of this sub-chapter, provided such equipment and accessories do not decrease the safety of operation of the motor vehicles on which they are used.”
Fruehauf wishes the court, however, to draw a distinction between State legislative regulation, which if not inconsistent, is clearly not preempted, and State common-law tort claims.
*796 Instructive in this regard is Silkwood v Kerr-McGee Corp. (464 US 238, supra), where the defendant Kerr-McGee, a processor of nuclear materials, was found liable in tort for punitive damages. Kerr-McGee was found to have not violated materially any of the regulations promulgated by the Federal agency which regulated nuclear power, and which regulations in fact preempted State regulations. (Pacific Gas & Elec. v Energy Resources Commn., 461 US 190.) Nevertheless, the Supreme Court let the State jury award of punitive damages stand, finding a tension between compliance with Federal regulations and the imposition of the damages award, but no preemption, in spite of the fact that one of the purposes of punitive damages is to regulate standards of conduct. "Whatever compensation standard a state imposes, whether it be negligence or strict liability, a licensee remains free to continue operating under federal standards and to pay for the injury that results. This presumably is what Congress had in mind when it preempted state authority to set administrative regulatory standards but left state compensatory schemes intact.” (Silkwood v Kerr-McGee Corp., supra, 464 US, at 264 [Blackmun, J., dissenting].)
The court moreover finds that State tort liability does not jeopardize the effectiveness of the Federal regulation, nor is there an impossibility of compliance with both Federal regulation and State common-law standards of care. In the area of health and safety regulations, this court is obliged to apply a presumption against preemption. (Hillsborough County v Automated Med. Labs, 471 US 707.) Moreover, Fruehauf cannot validly maintain that the purposes of the act are undermined by State tort actions, as it is clear that the regulations are meant to be minimum standards, and not preemptive in effect.
COMITY AND FEDERALISM
In this context, comity is the exercise of restraint, or abstention, that the State is cautioned to use in the exercise of its power when operating in an area that the Federal sovereign has regulated as well. It is contended here that a standard of care established by a State jury would be disruptive of Federal efforts to establish uniform safe design based on technical expertise. State juries, it is alleged, are incapable of adequately judging the wide variety of technological factors which must be considered in establishing a safe design, and would establish inconsistent standards.
*797 This court disagrees. A day does not pass where juries do not determine complex antitrust, medical malpractice and patent cases that would make the alleged technical complexity of the instant matter to seem elementary. As to the alleged varying standards argument, no authority has been cited in support of the proposition that a jury finding that an ICC bumper that complied minimal with the minimal regulation (49 CFR 393.86) was nonetheless defectively designed, would thereby disrupt Federal efforts to ensure uniform safe design standards. If anything, the intention of the Federal agency appears to have been to encourage manufacturers to surpass the mandated Federal regulations, not use them as a shield against lawsuits.
MANUFACTURING DEFECTS
In this case, plaintiff has the burden of proving enhanced injuries in order to make out a prima facie case. He will have to proceed by means of circumstantial proof including expert testimony and accident photographs, as the bumper in question was discarded or lost and cannot now be tested or examined.
However, there is some evidence that the ICC bumper was not "substantially constructed and firmly attached” to the trailer as required by 49 CFR 393.86, in that the force of the impact caused the bumper to bend underneath the trailer and for the trailer’s tires to be punctured and the axle twisted. Defendant Sherwood even testified that he was able to bend back the ICC bar with his bare hands before it broke off, a scenario that is hardly indicative of substantial mass. Where a product does not perform as it was intended and other reasonable causes of malfunction are excluded, a jury may infer that the product malfunctioned due to a defect in the product. Moreover, even if a particular defect is not proven, a jury may infer under some circumstances that an accident would only have occurred due to a product defect. (Halloran v Virginia Chems., 41 NY2d 386; Prata v National R. R. Passenger Corp., 70 AD2d 114.)
Read in a light most favorable to plaintiff, there is evidence that the ICC bar did not perform as intended. Clearly a prime purpose of the ICC bar was to prevent underride; it failed to do so, and all but sheared off in the accident. Numerous photographs graphically illustrate the severe vehicle under-ride that occurred. It will be the burden of the plaintiff at *798 trial, however, to establish that the ICC bumper was in the same condition prior to impact as it was at the time of delivery to defendant Fox. For the purposes of this motion, plaintiff has made a sufficient showing of defective manufacture to raise a triable issue.
SECOND COLLISION
This is a "second collision” case. The first collision was the contract between the front of the Oldsmobile and the rear of the Fruehauf tractor trailer. The second collision for which plaintiff seeks to cast Fruehauf in damages is the plaintiff’s contact with the interior part of the Oldsmobile which would not have contacted plaintiff but for the vehicle underride.
The second collision doctrine was first outlined in Larsen v General Motors Corp. (391 F2d 495), in which it was held that automobile manufacturers had a duty of care in the design of vehicles consonant with the state of the art to minimize the effect of accidents, and to avoid subjecting users of automobiles to an unreasonable risk of injury in the event of collision.
Second collision liability has been divided into two areas, one in which an allegedly defective component was itself the instrumentality causing the enhancement of injury, and two, where failure to equip the vehicle with a device would have prevented enhancement of the injury.
As a general proposition, second collision cases are difficult to prove, and the evidence of "enhanced” injuries must necessarily include a determination of "what might have happened” under different circumstances, a somewhat metaphysical concept. (Caiazzo v Volkswagenwerk A.G., 647 F2d 241, 245.)
However, the outline of plaintiff’s prima facie case is set out in Caiazzo (supra, 647 F2d, at 250, quoting Huddell v Levin, 537 F2d 726, 737-738): " 'First, in establishing that the design in question was defective, the plaintiff must offer proof of an alternative safer design, practicable under the circumstances . . . Second, the plaintiff must offer proof of what injuries, if any, would have resulted had the alternative, safer design been used . . . Third, . . . the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defective design.’ ”
The Caiazzo court noted that the proof of a prima facie case, i.e., that it is more probable than not that the alleged defect *799 aggravated or enhanced the injuries resulting from the initial collision, will generally be in the form of expert testimony. (Caiazzo v Volkswagenwerk A.G., supra, at 250.)
In this connection, plaintiff offers the affidavits of two experts, John O. Moore, a research scientist, and Frank C. Laine, an accident investigator. Fruehauf has countered with its own experts, John W. Harper, a mechanical engineer, and C. Eugene Buth, a civil and structural engineer. The plaintiff’s experts have stated their opinions in respect to their own reconstruction of the accident, and the alleged dynamics of the invasion of the passenger compartment of the Oldsmobile by the ICC bar and the corner of the trailer bed. Dr. Buth disputes the basis for these experts’ assertions, noting, among other things, his opinion that but for the vehicle underride the Oldsmobile might have collided with the center lane divider. Dr. Buth also criticizes the plaintiff’s experts’ theories as based on partial evidence, and as wholly inadequate to explain all the damage sustained by man and machine, and furthermore, in Dr. Buth’s opinion, that Mr. Laine’s estimation of the respective speeds of the vehicles based on observations of impact damage is an imprecise technique with a wide margin of error.
However, it is well established that a clash of experts’ affidavits is not a proper means for resolving factual issues on a motion for summary judgment. (Matter of Sylvestri, 44 NY2d 260.) The allegations by Fruehauf concerning its own theories as to what might have occurred had the Oldsmobile deflected off the tractor trailer instead of being wedged underneath it will be evaluated by the trier of fact, not this court, which is compelled to accept Mr. Laine and Mr. Moore’s opinions as true for the purpose of this motion. In that light, plaintiff has met his burden at this stage of the proceedings.
IMPLIED WARRANTY
The final matter is the efficacy of plaintiff’s cause of action sounding in breach of implied warranty of merchantability or fitness for use, and of the defendants Fox and Sherwood’s corresponding cross claims against Fruehauf.
In respect to the plaintiff the court agrees with Fruehaufs contention that the breach of warranty cause of action is indeed time barred, and must be dismissed. The Statute of Limitations ran out four years after tender of delivery in November 1978, and before this action was commenced in *800 1984. Although Fruehauf served an initial answer which did not raise an affirmative defense of the Statute of Limitations, in 1985 plaintiff stipulated with Fruehauf to accept service of an amended answer containing said affirmative defense, thereby affording sufficient notice to plaintiff. Therefore, plaintiff is not prejudiced by Fruehauf s assertion of said defense at this time. (See, Fahey v County of Ontario, 44 NY2d 934; Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C3211:62, at 66.)
However, the corresponding cross claims of defendants Fox and Sherwood which are governed by a six-year Statute of Limitations are not time barred (CPLR 213 [2]), nor are they superfluous (Doyle v Happy Tumbler Wash-O-Mat, 90 AD2d 366). Moreover, the contention of Fruehauf that it had no duty to construct a bumper that was fit to crash into is unavailing, as that is precisely the function of said product. Finally, the defendant Sherwood irrespective of any lack of privity is within that class of person who is under the umbrella of warranty protection pursuant to UCC 2-318. (Doyle v Happy Tumbler Wash-O-Mat, supra; Heller v U. S. Suzuki Motor Corp., 64 NY2d 407.)
CONCLUSION
The court finds that Fruehauf did not discharge its duty as a matter of law by conforming its design to 49 CFR 393.86; that regulation is a minimum standard, and compliance with it is merely some evidence of due care. (Hubbard-Hall Chem. Co. v Silverman, 340 F2d 402; Phillips v Roux Labs., 286 App Div 549; Jiminez v Dreis & Krump Mfg. Co., 736 F2d 51.) In view of the tortured but static history of vehicle underride regulation, a reasonable jury might indeed find that safer alternative designs were available to Fruehauf, and that failure to adopt such alternatives constituted a failure of due care.
Moreover, this court must apply a presumption against preemption, and there is no indication in the FMCSR that Congress expressly or impliedly preempted common-law damage suits for unsafe production manufacture or design.
The court has carefully considered the other contentions raised by Fruehauf and finds them to be without merit.
The motion by Fruehauf for summary judgment is denied in all respects, except that the plaintiffs cause of action for breach of implied warranty is dismissed.