569 So.2d 476 (1990)
William L. MURRAY, Etc., et al., Appellants/Cross-Appellees,
v.
Robert A. BRIGGS, et al., Appellees/Cross-Appellants.
Nos. 88-2476, 89-46, 89-47, 89-734 and 89-775.
District Court of Appeal of Florida, Fifth District.
September 27, 1990.
Rehearing Denied November 15, 1990.
*477 Edward A. Perse of Horton, Perse & Ginsberg and Nance, Cacciatore & Sisserson, Miami, for William L. Murray.
Lora A. Dunlap of Fisher, Rushmer, Werrenrath, Keiner, Wack & Dickson, P.A., Orlando, for Hughes Supply, Inc.
Jerry H. Jeffery of Jeffery & Thomas, P.A., Maitland, for Bennett Truck Equipment, Inc.
J. David Walsh and Keith C. Warnock of Cameron, Marriott, Walsh & Hodges, P.A., Daytona Beach, for Robert A. Briggs.
GRIFFIN, Judge.
This personal injury action arose out of a collision between a light pickup truck and a flat-bed delivery vehicle on February 14, 1986. Defendant, Robert A. Briggs ("Briggs"), was operating a Nissan pickup truck at approximately 1 p.m. on U.S. Route 192 in Brevard County, Florida. A friend, Stephen Murray ("Murray"), was his passenger. Briggs became distracted and rear-ended a lawfully stopped flat-bed delivery truck owned by Hughes Supply, Inc. ("Hughes Supply"). The flat-bed truck owned by Hughes Supply had no underride protection and the Nissan pickup was moving with sufficient speed and force that it continued under the bed of the Hughes Supply truck for approximately six feet, resulting in the compromise of the Nissan cab. Murray was severely injured.
Murray, through his guardian ad litem, William L. Murray ("plaintiff"), sued Briggs, Hughes Supply, and Bennett Truck, the alleged manufacturer of the Hughes Supply vehicle. Plaintiff alleged Hughes Supply and Bennett Truck were *478 negligent for not putting a bumper on the truck that would prevent or lessen injury to vehicles impacting with the rear. The jury rendered a verdict in favor of the plaintiff against Briggs but found no liability on the part of Hughes Supply or Bennett Truck.
The threshold issue in this case is whether, at the time the accident occurred, the Hughes Supply truck was engaged in "interstate commerce" for purposes of application of the Federal Motor Carrier Safety Regulations, originally promulgated by the Bureau of Motor Carriers of the Interstate Commerce Commission ("I.C.C.")[1] under the Federal Motor Carriers Act ("MCA").[2] Among these safety regulations is 49 C.F.R. § 393.86, entitled "Rear End Protection", which provides that a regulated motor vehicle whose body or chassis assembly is more than 30 inches from the ground has to be provided with a "substantially constructed and firmly attached" bumper affording rear end protection (an "I.C.C. bumper").[3] Plaintiff contends that the Hughes Supply vehicle was an MCA regulated vehicle required to have an I.C.C. bumper and that noncompliance with the rear end protection regulation was evidence of negligence or negligence per se. Although the regulation was extensively discussed during the trial, the trial court ruled that the regulation did not apply to the Hughes Supply truck; thus, the plaintiff was not allowed an instruction that failure to use an I.C.C. bumper was evidence of negligence or negligence per se.
Under the MCA, the test to determine whether goods are moving in intra or interstate transit focuses on the "essential character" of the shipment. Texas & N.O.R. Co. v. Sabine Tram Co., 227 U.S. 111, 122, 33 S.Ct. 229, 233, 57 L.Ed. 442, 447 (1913). Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment. Unquestionably, a factor to take into account in determining the "fixed and persisting intent" of the shipper is whether, at the time the transportation commenced, a specific interstate destination for the shipment was definitely planned. Middlewest Motor Freight Bureau v. I.C.C., 867 F.2d 458, 460-61 (8th Cir.), cert. denied, Missouri Div. of Transp. v. I.C.C., ___ U.S. ___, 110 S.Ct. 234, 107 L.Ed.2d 185 (1989). Intent, however, is ascertained from all the facts and circumstances surrounding the transportation, including the presence (or absence) of certain indicia of "through carriage" such as through billing, uninterrupted movement, continuous possession by the carrier or unbroken bulk. See, e.g., Texas v. United States, 866 F.2d 1546, 1556 (5th Cir.), reh. denied, 874 F.2d 812 (5th Cir.1989). The shipper's expressed intent also appears relevant. Pittsburgh-Johnstown-Altoona Express, Inc., MC-C-30129, (I.C.C. Slip, February 6, 1990). Different factors may be important in certain types of cases but *479 not in others. See Calif. Trucking Ass'n v. I.C.C., 900 F.2d 208, 212 (9th Cir.1990). Applying the relevant factors to the case before us, we conclude that the Hughes Supply truck involved in this accident was involved in "intrastate", not "interstate", commerce and that the I.C.C. bumper regulation did not apply to the Hughes Supply truck at the time of this accident.
Hughes Supply is engaged in the business of wholesale and retail distribution and sale of construction supplies in various locations in the southeast. The sales of Hughes Supply fall into three general categories: inventory sales, special orders, and direct sales. Over sixty percent of Hughes Supply's 1986 sales were out of inventory. Inventory items are bought and stored by Hughes Supply for indefinite periods of time until purchased by a customer. Delivery to customers is provided by Hughes Supply, which maintains regularly scheduled deliveries to various parts of Florida.
Approximately twenty-five percent of Hughes Supply's 1986 sales were direct sales. In a direct sale, the manufacturer ships the goods directly to the customer and Hughes Supply is not involved in delivery of the purchased items.
Roughly fifteen percent of Hughes Supply's 1986 sales were special order sales, consisting of items Hughes Supply either did not maintain in regular inventory or which were out of stock. A special order is one in which Hughes Supply receives a specific order from a specific customer and obtains the item from the manufacturer. Such orders are placed by Hughes Supply in its own name. The manufacturer, who does not know the identity of the Hughes Supply customer or that it is a special order, ships directly to Hughes Supply. The invoices or bills of lading bear the Hughes Supply name as the ultimate purchaser and Hughes Supply is ultimate destination. Hughes Supply takes title to the items and bears the risk of loss once they are delivered to the Hughes Supply warehouse. Such special order items are received in the Hughes Supply warehouse and sometimes opened, checked, or repackaged. They are always redocumented with new invoices.
The record reveals that Hughes Supply maintains two fleets of trucks  one for its intrastate activities, another for interstate transport. Truck # 625, the truck involved in this accident, was part of the intrastate fleet, assigned to the water and sewer branch of Hughes Supply, delivering both special order and stock items according to the regular delivery schedule. The record indicates that Hughes Supply intended these deliveries to be local, not interstate commerce, and believed the Federal Motor Carrier Safety Regulations were inapplicable to these in-state deliveries.
On the day of the accident, an employee of Hughes Supply in the water and sewer branch was using truck # 625 to make the regularly scheduled (Monday/Wednesday/Friday) delivery to Brevard and Indian River Counties. Hughes Supply does not maintain records of what items were delivered on any particular truck on any given day, and the driver could recall only one delivery he made on February 14. He testified that, when the accident occurred at approximately 2 p.m., he had only one delivery left to make, to H.E. Miller, Inc., in Rockledge. After the accident, he was able to make the delivery and return to Orlando, where he clocked out at 4:18 p.m.
By spot checking invoices billed on February 18, 1986, the manager of the water and sewer branch of Hughes Supply was able to identify a few other delivery orders that were on truck # 625 on the day of the accident. One of the items he found was a special order for three one and one-half inch couplings, costing $44.89, placed by a Brevard County customer, Fearon Construction Company, on February 10, 1986. According to the documentation, Hughes Supply placed the order with Mueller Company in Decatur, Illinois on February 11, 1986. The item was shipped to Hughes Supply by overnight air freight and was received by Hughes Supply on February 12, 1986. The invoice from Mueller showed Hughes Supply as the purchaser. The item was delivered by Hughes Supply to Fearon *480 on February 14, the next regular delivery run to Brevard County.
The appellant contends, in essence, that Hughes Supply's practice of mingling special order and inventory items on delivery vehicles, and more particularly, the presence of the Fearon Construction order on truck # 625 on the day of the accident, establishes the Hughes Supply truck was "in interstate commerce." However, Hughes Supply's knowledge that it had a Florida purchaser for these three one and one-half inch couplings at the time they were ordered from out of state does not necessarily make the truck that delivers them to the local customer an interstate motor carrier. In this case, all other pertinent factors militate against the Hughes Supply truck being engaged in interstate commerce at the time of the accident.
Over seventy percent of the items carried by the Hughes Supply intrastate fleet of trucks are items stocked in inventory. A pertinent example would be the one delivery the Hughes Supply driver had left to make at the time of the accident. The record indicates the goods for that delivery had been shipped into Hughes Supply's inventory (from out of state) on various dates, one as long as four months earlier. Transportation of such inventory items to customers is usually not considered "interstate commerce" for purposes of the MCA. See Frito-Lay, Inc. v. Wisconsin Labor and Industry Review Comm'n, 95 Wis.2d 395, 290 N.W.2d 551, 557-58 (Wis. Ct. App. 1980), aff'd, 101 Wis.2d 169, 303 N.W.2d 668 (Wis. 1981), cert. denied, 454 U.S. 884, 102 S.Ct. 376, 70 L.Ed.2d 200 (1981). Moreover, in the cases that do find interstate commerce, the entire shipment, or certainly the larger part of it, meets the test of "fixed and persisting intent" for delivery to a specific interstate destination, not just one small part of the shipment. The key is not how much of Hughes Supply's overall business is interstate, it is whether truck # 625 was engaged in interstate commerce when the accident occurred. The record here discloses that special orders are only fifteen percent of Hughes Supply's business, and some part of the special order business comes from within Florida. We cannot assume that, on the day of this accident, the Hughes Supply truck carried more than three one and one-half inch couplings that were arguably in interstate transit, and we cannot see how the mere presence of these items is sufficient to make this delivery to Brevard County from Orlando an interstate shipment that requires a federally regulated motor carrier. Based on this record, the "essential character" of the commerce in question was local, not interstate.
Even if we were to find this Orange-Brevard trip by truck # 625 was in interstate commerce, we question whether the rear end protection regulation should be applied as plaintiff suggests. To begin with, the notion that violation of an administrative regulation constitutes negligence per se is not without its critics. Jackson v. Harsco Corp., 364 So.2d 808 (Fla. 3d DCA 1978) (Barkdull, J., concurring specially), cert. denied, 376 So.2d 72 (Fla. 1979). Also, although several courts seem comfortable with the concept,[4] we are not satisfied that a federal regulation should necessarily control state law questions of negligence by enlarging common law duties or creating new duties. Cadillac Fairview of Florida, Inc. v. Cespedes, 468 So.2d 417, 421 (Fla. 3d DCA), rev. denied, 479 So.2d 117 (Fla. 1985). Florida does have a statute requiring a bumper limiting clearance to thirty inches on trucks; however, the statute only applies to light weight trucks and contains *481 no strength requirement. § 316.251, Fla. Stat. (1985). It is illogical that in a hypothetical situation where two identical delivery trucks like # 625 are rear-ended, the presence or absence of cargo in interstate commerce on one of the vehicles would determine whether the owner of the vehicle was per se negligent or, as the jury found in this case, not negligent at all.[5]
At the very least, any regulation that purports to establish a duty of reasonable care must be specific. King v. Avtech Aviation, Inc., 655 F.2d 77 (5th Cir.1981); Fagerquist v. Western Sun Aviation, Inc. 191 Cal. App.3d 709, 236 Cal. Rptr. 633 (Cal. App. 4th Dist. 1987). One that sets out only a general or abstract standard of care cannot establish negligence. See Short v. Spring Creek Ranch, Inc., 731 P.2d 1195, 1198 (Wyo. 1987). Here the regulation is vague and general. The federal government has never been successful in establishing definite strength and design standards for this regulation. Garcia v. Rivera, 143 Misc.2d 788, 541 N.Y.S.2d 880 (N.Y. Sup. Ct. 1989); rev'd, 553 N.Y.S.2d 378 (A.D. 1 Dept. 1990).[6] Indeed, one of the most strongly controverted issues in the trial of this case was what design and strength bumper is "substantially constructed" and "firmly attached." At trial, "substantially constructed" meant anywhere from 6,900 pounds up to nearly 100,000 pounds, depending on the employer of the expert testifying. Moreover, the regulation does not specify where the bumper is to be located.[7] "Substantially constructed" and "firmly attached" is a standard too vague to apply in any meaningful way, even (or perhaps, especially) in a case such as this where no bumper was used at all.
On the issues remaining in this consolidated appeal pertaining to costs, we reverse. The prevailing defendants, Hughes Supply and Bennett Truck, are entitled to recover taxable costs even though the costs were paid by the insurers. Aspen v. Bayless, 564 So.2d 1081 (Fla. 1990). Briggs is entitled to an evidentiary hearing to determine the necessity and reasonableness of compensation of plaintiff's expert witness taxed against Briggs, American Indemnity Co. v. Comeau, 419 So.2d 670, 672 (Fla. 5th DCA 1982), including whether and to what extent the expert's testimony pertained to the successful prosecution of plaintiff's claim against Briggs.
We decline to reverse the trial court's denial of the motions to recuse the trial judge, trusting that the Florida Supreme Court's ruling in Aspen v. Bayless will adequately illuminate the trial court's obligations in assessing costs.
AFFIRMED, in part, REVERSED, in part, and REMANDED for further proceedings consistent with this opinion.
COBB and W. SHARP, JJ., concur.
NOTES
[1] The jurisdiction of the I.C.C. is set out at 49 U.S.C. § 10521. The authority conferred upon the I.C.C. is not coextensive with the plenary authority of Congress under the Commerce Clause. South Pacific Transp. Co. v. I.C.C., 565 F.2d 615 (9th Cir.1977).
[2] 49 U.S.C.App. § 2501 et seq.
[3] 49 C.F.R. § 393.86 Rear end protection.

Every motor vehicle, except truck-tractors, pole trailers, and vehicles engaged in driveaway-towaway operations, the date of manufacturer of which is subsequent to December 31, 1952, which is so constructed that the body or the chassis assembly if without a body has a clearance at the rear end of more than 30 inches from the ground when empty, shall be provided with bumpers or devices serving similar purposes which shall be so constructed and located that: (a) The clearance between the effective bottom of the bumpers or devices and the ground shall not exceed 30 inches with the vehicle empty; (b) the maximum distance between the closest points between bumpers, or devices, if more than one is used, shall not exceed 24 inches; (c) the maximum transverse distance from the widest part of the motor vehicle at the rear to the bumper or device shall not exceed 18 inches; (d) the bumpers or devices shall be located not more than 24 inches forward of the extreme rear of the vehicle; and (e) the bumpers or devices shall be substantially constructed and firmly attached. Motor vehicles constructed and maintained so that the body, chassis, or other parts of the vehicle afford the rear end protection contemplated shall be deemed to be in compliance with this section.
[4] Wallace v. Ener, 521 F.2d 215 (5th Cir.1975) (violations of 49 C.F.R. sections 392.22 and 939.95 are negligence per se under Georgia law); Taylor v. Pennsylvania R.R. Co., 246 F. Supp. 604 (D.Del. 1965) (violation of federal motor carrier regulation requiring stop before railroad crossing is negligence per se under Delaware law); Hageman v. TSI, Inc., 786 P.2d 452 (Colo. App. 1989) (violation of federal regulations requiring disabled vehicle to place warning devices for approaching traffic and to pull onto shoulder of road constitutes negligence per se under Colorado law); Strong v. Freeman Truck Lines, Inc., 456 So.2d 698 (Miss. 1984) (violations of 49 C.F.R. sections 392.21 and -.22 are negligence per se under Mississippi law). See Florida Freight Terminals, Inc. v. Cabanas, 354 So.2d 1222 (Fla. 3d DCA 1978). See also Restatement (Second) of Torts § 286 (1965).
[5] We recognize that under either scenario the absence of a bumper may not be the proximate cause of the accident. Cf. Banat v. Armando, 430 So.2d 503 (Fla. 3d DCA 1983), rev. denied, 446 So.2d 99 (Fla. 1984).
[6] This is the only case we have identified that has applied the I.C.C. bumper regulation in a state tort action.
[7] The plaintiff's expert testified that a 61,000 pound bumper would have resulted in a crush distance of only 2.35 feet and the injuries would have been minor if the bumper were placed on the very back of the truck rather than twenty-four inches inward. If twenty-four inches inward were the placement, the injuries would likely have been similar to those the plaintiff actually suffered.