ESTATE OF Leon P. SZLESZINSKI, by its Special
Administrator and Darlene Szleszinski,
Petitioners-Appellants,

v.

LABOR & INDUSTRY REVIEW COMMISSION,
Respondent-Respondent,

MIDWEST COAST TRANSPORT,
Respondent-Respondent-Petitioner,

TRANSHIELD TRUCKING and
Transhield Leasing Company, Respondents.

Supreme Court

*No. 2004AP3033. Oral argument April 26, 2007.
—Decided July 18, 2007.)*

2007 WI 106

(Also reported in 736 N.W.2d 111.)

For the respondent-respondent-petitioner there were briefs by *Janice Rhodes,* and *Kravit, Hovel & Krawczyk, S.C.,* Milwaukee, and oral argument by *Janice Rhodes.*

For the petitioners-appellants there was a brief by *Matthew A. Biegert* and *Doar Drill, S.C.,* New Richmond, and oral argument by *Matthew A. Biegert.*

For the respondent-respondent the case was argued by *David C. Rice,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. LOUIS B. BUTLER, JR., J. Midwest Coast Transport ("Midwest"), a commercial trucking company, seeks review of a published opinion of the court of appeals[1] reversing a decision of the Labor and Industry Review Commission ("LIRC") that determined Midwest did not discriminate for reasons of disability against Leon P. Szleszinski ("Szleszinski"), an interstate com-

---

[1] *Estate of Szleszinski v. LIRC,* 2005 WI App 229, 287 Wis. 2d 775, 706 N.W.2d 345.

mercial truck driver. Midwest prohibited Szleszinski, who suffered from Wilson's disease, from driving trucks leased to Midwest by Transhield Trucking and Transhield Leasing Company ("Transhield") after receiving a doctor's recommendation that Szleszinski be disqualified from driving commercial trucks interstate due to his diagnosis of Wilson's disease.

¶ 2. Szleszinski filed a disability discrimination claim under the Wisconsin Fair Employment Act ("WFEA") against Midwest and Transhield. Mr. Szleszinski died while his claim was pending, and his estate was substituted as complainant.[2] The hearing examiner[3] ruled in Szleszinski's favor. LIRC reversed the hearing examiner's decision, concluding that the medical evaluation of the physician who recommended disqualifying Szleszinski was sufficiently "individualized" under Wis. Stat. § 111.34(2)(b) and (c) (2005–06)[4] of the WFEA, and that Szleszinski could have challenged the evaluation under a dispute resolution procedure contained in United States Department of Transportation ("DOT") regulations.

¶ 3. After the Washburn County Circuit Court, Honorable Eugene D. Harrington, affirmed LIRC's decision, the court of appeals reversed, concluding that Szleszinski was not required to seek a determination of medical qualification from the DOT under the dispute

---

[2] For consistency, this opinion will refer to both the late Leon P. Szleszinski and the Estate of Leon P. Szleszinski as "Szleszinski."

[3] The WFEA refers to persons who hear and decide WFEA complaints as "examiners" and not as "administrative law judges." *See* Wis. Stat. § 111.39(4). This opinion, therefore, will use the term "examiner."

[4] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

resolution procedure before initiating his WFEA disability discrimination claim because (1) "the WFEA does not require individuals to exhaust other administrative remedies," and (2) the DOT procedure was inapplicable in this case because it applies only in disputes between the driver's physician and the carrier's physician, and both physicians in this case were hired by Midwest. *Estate of Szleszinski v. LIRC*, 2005 WI App 229, ¶¶ 17–21, 287 Wis. 2d 775, 706 N.W.2d 345. The court of appeals also concluded that the medical evaluation upon which Midwest relied was "insufficient . . . as a matter of law" because it was not "individualized" under the WFEA. *Id.*, ¶ 34.

¶ 4. Midwest sought review of the court of appeals' conclusion that Szleszinski was not required to seek a determination regarding medical qualification from the DOT under the dispute resolution procedure before filing his WFEA claim, and we granted review to address this issue.[5]

---

[5] The only issue on review before this court sought by Midwest is whether Szleszinski was required to seek a determination regarding his medical qualifications to be a commercial driver under 49 C.F.R. § 391.47 before filing his WFEA claim. Midwest did not seek review of the court of appeals' conclusions that Dr. Windhorst's evaluation was neither a valid medical examination under the applicable DOT regulations nor an individualized evaluation as required by Wis. Stat. § 111.34(2)(c) of the WFEA. *See Szleszinski*, 287 Wis. 2d 775, ¶¶ 33–36.

The dissent asserts that the majority opinion disregards LIRC's decision and memorandum opinion, including LIRC's factual findings. Dissent, ¶ 68–73. The facts relied upon in our opinion are taken entirely from LIRC's February 26, 2004, findings of fact. Yet, the issues the dissent wants to address were not included in Midwest's petition for review, and cannot now be raised or argued by Midwest as a matter of right. Wis. Stat. § (Rule) 809.62(6). *See Ranes v. American Family Mut.*

¶ 5. We conclude that a driver need not seek a determination of medical qualification from the DOT prior to filing a disability discrimination claim under the WFEA. We also conclude that when a person's medical and physical qualifications to be an interstate commercial driver are material to a WFEA claim, and a dispute arises concerning those qualifications that cannot be resolved by facial application of the DOT regulations, such a dispute should be resolved by the DOT under its dispute resolution procedure. We further conclude that, under the WFEA's burden-shifting scheme, the carrier, not the driver, is the party that must seek a determination of medical and physical qualification from the DOT if the carrier intends to offer a defense that the driver was not qualified for medical reasons.

¶ 6. With regard to the issue before us on review, we therefore reverse the decision of LIRC and reinstate the hearing examiner's decision. We remand to LIRC to reinstate the decision and order of the hearing examiner and to grant the award ordered by the hearing examiner in this case.[6]

I

¶ 7. LIRC's February 26, 2004 decision contained the following findings of fact, which are undisputed. In

_____

*Ins. Co.,* 219 Wis. 2d 49, 54 n.4, 580 N.W.2d 197 (1998); *State v. Thierfelder,* 174 Wis. 2d 213, 228, 495 N.W.2d 669 (1993). "If an issue is not raised in the petition for review or in a cross petition, 'the issue is not before us.' " *Jankee v. Clark County,* 2000 WI 64, ¶ 7, 235 Wis. 2d 700, 612 N.W.2d 297 (citation omitted). We decline to reach issues not raised by the parties in this case.

[6] We note that the hearing examiner's order required that the award be offset by Szleszinski's earnings from other employment. *See Estate of Leon P. Szleszinski v. Transhield Trucking,* ERD No. 199603914 (ERD, August 7, 2003).

1981, at the age of 22, Szleszinski was diagnosed with Wilson's disease, a disorder of the metabolism in which a person is unable to process copper normally. The disease is marked by an increased output of copper in the urine, deposits of copper in the tissues, cirrhosis of the liver, pigmentation of the corneas, and degenerative changes in the central nervous system.

¶ 8. Szleszinski was employed as a truck driver for 15 years prior to his death in March 1999. Szleszinski had held a commercial drivers license since the early 1990s. In June 1995, Szleszinski was hired as an over-the-road truck driver by Transhield, which leases its trucks and drivers exclusively to Midwest. Midwest transports semi-trailer loads of freight in interstate commerce. Midwest required its drivers to be medically certified pursuant to federal motor carrier safety regulations. At the time of his hiring, Szleszinski disclosed that he had Wilson's disease and provided documentation demonstrating he had passed a medical examination and was certified to drive under the applicable DOT regulations.

¶ 9. In March 1996, Midwest received reports from two different sources that Szleszinski was driving erratically. Both reports alleged that Szleszinski's truck was observed weaving in traffic, and one alleged it forced another onto the shoulder of the highway. Szleszinski disputed that these incidents occurred. Midwest suspended Szleszinski from driving and sought a medical evaluation to determine whether Szleszinski was physically fit to drive.

¶ 10. Upon the recommendation of Occupational Health Associates of South Dakota ("OHA"), the company on which Midwest relied for medical evaluation of its drivers, Szleszinski was examined by Dr. Ali Choucair, a neuro-oncologist at the Marshfield Clinic. In a report

dated March 19, 1996, Dr. Choucair found an "established diagnosis of Wilson's disease with very mild demonstrated deficit on the neurological examination." He recommended an MRI scan, "detailed psychometrics," and a DOT road test. He concluded, however, that "[Szleszinski's] deficit I do not believe is such that will prevent him from operating a motor vehicle."

¶ 11. Midwest then forwarded Dr. Choucair's evaluation and Szleszinski's medical records to OHA. Dr. Dana Windhorst, the director of OHA's Department of Occupational Medicine, reviewed the records but did not personally examine Szleszinski. On March 21, 1996, Dr. Windhorst issued a report which states, in relevant part:

> I have reviewed Mr. Szleszinski's records, specifically the note from Ali Choieair [sic], M.D., Neurologist . . . . As I understand it, Mr. Szleszinski has a 19–year history of Wilson's disease, with diagnosis confirmed at the Mayo Clinic. The laboratory tests on Dr. Choieair's [sic] note was certainly consistent with Wilson's disease. As far as I can see, there is no question that this is the confirmed diagnosis, at least based on the information available to me.
>
> The neurological examination did indicate some mild neurological deficits, specifically in the areas of coordination, and possibly some extrapyramidal problems as well.
>
> In addition, there is the history, apparently twice, of this driver being observed to swerve on the highway, suggesting some problem with functional coordination during his driving.
>
> Wilson's disease is a progressive neurological disease, and this is of grave concern, given the responsibilities of driving large commercial vehicles on the highways. The

Department of Transportation Conference on Neurological Disorders and Commercial Drivers, dated July 1988, recommends, without exception, disqualification for individuals with confirmed diagnosis of Wilson's disease. Putting all this together, I cannot make a recommendation for this individual to be medically certified for DOT licensure. It is also my opinion that, regardless of the results of psychometric testing and MRI, that I would not change this recommendation.

The report of the Department of Transportation Conference on Neurological Disorders ("Conference Report") referenced in Dr. Windhorst's report recommended changes to 49 C.F.R. § 391.41(b)(7), (8) and (9), the administrative rules concerning regulation of drivers with neurological disorders. The conference report's specific recommendation concerning Wilson's disease was not adopted by DOT rule makers.[7]

¶ 12. Based on Dr. Windhorst's recommendation, on March 26, 1996, Midwest informed Szleszinski that he would not be allowed to drive equipment leased to Midwest. Because Transhield leased equipment exclusively to Midwest, this decision, in effect, ended Szleszinski's employment with Transhield.

¶ 13. On April 5, 1996, Dr. Stanley Skinner, a neurologist at the Minnesota Clinic of Neurology, examined Szleszinski regarding his employment with another trucking company.[8] Dr. Skinner determined that

---

[7] The dissent repeatedly emphasizes this Conference Report relied upon by Dr. Windhorst, notwithstanding the fact that the Department of Transportation chose not to incorporate the Report's recommendation of unequivocal grounds for disqualification for persons with Wilson's disease in its rules. *See* dissent, ¶¶ 56–57, 62, 84–86.

[8] Thus, Szelszinski received three medical evaluations, two from the carrier (Dr. Choucair and Dr. Windhorst) and one from

the diagnosis of Wilson's disease should not affect Szleszinski's employment as a truck driver. Dr. Gary A. Johnson reviewed an MRI of Szleszinski's head at his request and found that it was normal.

¶ 14. Despite the adverse evaluation of Dr. Windhorst, Szleszinski's DOT certification was never suspended or revoked, and Szleszinski continued to work as a commercial truck driver.

¶ 15. On October 3, 1996, Szleszinski filed a disability discrimination complaint with the Wisconsin Department of Industry, Labor and Human Relations (n/k/a Department of Workforce Development ("DWD")) alleging Midwest and Transhield unlawfully terminated his employment because of his disability, Wilson's disease. In an initial determination dated September 15, 1997, and amended on February 18, 1999, an equal rights officer stated there was probable cause to believe Midwest and Transhield had discriminated against Szleszinski.

¶ 16. On March 11, 1999, Szleszinski died. On April 2, 2002, the personal representative of the Estate of Szleszinski was substituted as the complainant in the matter.

---

his own physician, Dr. Skinner. The DOT dispute resolution procedure discussed at length later in this opinion, 49 C.F.R. 391.47, applies in disputes between a physician for the carrier and a physician for the driver. *See infra,* ¶ 31. Under the unique facts of this case, the dispute resolution procedure does not apply because (1) the court of appeals concluded that Dr. Windhorst's evaluation was not valid under the DOT regulations; (2) Midwest has not sought review of this conclusion; and (3) no dispute exists between the remaining valid evaluations of Dr. Choucair and Dr. Skinner regarding Szleszinski's medical qualifications. *See infra,* ¶ 42 and n.18. Nevertheless, we address the appropriate procedure for LIRC to follow in WFEA discrimination claims involving medical qualifications of drivers to provide guidance in future cases.

271

¶ 17. After a hearing, examiner Gary Olstad issued a decision dated August 7, 2003, determining that: (1) Midwest was Szleszinski's de facto employer within the meaning of the WFEA; (2) Transhield was not Szleszinski's employer within the meaning of the WFEA; (3) Midwest discriminated against Szleszinski by terminating his employment because he had Wilson's disease; and (4) Transhield did not terminate Szleszinski's employment. Examiner Olstad dismissed the complaint against Transhield[9] and ordered Midwest to pay Szleszinski back pay and benefits, plus reasonable attorney fees and costs.

¶ 18. Midwest petitioned LIRC for review of Examiner Olstad's decision. On February 24, 2004, LIRC issued a decision reversing the examiner's decision. LIRC concluded that both Midwest and Transhield were employers within the meaning of the WFEA, and that Szleszinski had proven he was disabled within the meaning of the WFEA. However, it further concluded Szleszinski failed to prove that Midwest had discriminated against him because of his disability. LIRC also concluded that Dr. Windhorst's opinion was sufficiently "individualized" to satisfy the requirements of Wis. Stat. § 111.34(2)(b) and (c), and Midwest could reasonably rely on Dr. Windhorst's report to prove Szleszinski's disability was reasonably related to his ability to adequately undertake the job-related responsibilities of his employment. LIRC noted that Szleszinski could have challenged Dr. Windhorst's medical evaluation by using a DOT dispute resolution procedure. LIRC stated: "It is important to note that [Szleszinski] was

---

[9] Transhield's dismissal as a party to this action has not been challenged by Szleszinski. Transhield is not a party to this review.

272

not required to helplessly accept Dr. Windhorst's refusal to medically certify him. Federal regulations provide an appeal mechanism [the DOT dispute resolution procedure] through which disputed DOT medical certifications can be reviewed."

¶ 19. Szleszinski commenced an action in the circuit court seeking review of LIRC's decision. In a memorandum decision dated October 19, 2004, the circuit court affirmed LIRC's decision.

¶ 20. Szleszinski appealed the circuit court's decision. The court of appeals issued an opinion reversing LIRC on multiple grounds. First, the court of appeals concluded that Szleszinski was not required to seek a determination regarding medical qualification from the DOT under its dispute resolution procedure before initiating a WFEA disability discrimination claim because "the WFEA does not require individuals to exhaust other administrative remedies." *Szleszinski,* 287 Wis. 2d 775, ¶¶ 17–18. Second, the court concluded that the DOT procedure did not apply in this case because the regulation concerns only disagreements between the "physician for the driver" and the "physician for the motor carrier," and the disagreement in this case was between Dr. Choucair and Dr. Windhorst, who were both physicians for Midwest. *Id.,* ¶¶ 19–21. Third, the court of appeals affirmed LIRC's determination that Midwest was an employer within the meaning of the WFEA. *Id.,* ¶¶ 22–30. Fourth, the court concluded that the DOT regulations require an in-person examination of the driver and not just a paper review of the driver's medical history, rendering Dr. Windhorst's report "insufficient . . . as a matter of law." *Id.,* ¶¶ 32–34. And, fifth, the court concluded that because Dr. Windhorst's report disqualified Szleszinski based solely upon a 1983 DOT study committee recommendation of automatic

273

disqualification for a diagnosis of Wilson's disease, the doctor's report was insufficient under the WFEA, which requires a case-by-case assessment of each individual. *Id.,* ¶¶ 35–36.

¶ 21. On October 27, 2005, Midwest filed a petition for review with this court. Midwest's petition raised only one issue for review, whether a commercial driver who is disqualified by the carrier for a medical condition must seek a determination from the DOT under its regulations concerning his or her medical qualifications before bringing a disability discrimination claim under the WFEA. This court granted Midwest's petition to address this issue. This court also directed LIRC (which had not sought review of the court of appeals' decision) to file a brief addressing the issue raised by Midwest's petition.

## II

¶ 22. When reviewing the decision of an administrative agency, this court reviews the agency's decision and not the decision of the court of appeals or the circuit court. *Racine Harley-Davidson, Inc. v. Div. of Hearings and Appeals,* 2006 WI 86, ¶ 8 n.4, 292 Wis. 2d 549, 717 N.W.2d 184. Our review is limited to (1) whether the agency kept within its jurisdiction; (2) whether it acted according to law; (3) whether it acted arbitrarily, oppressively, or unreasonably; and (4) whether the evidence was sufficient that the agency might reasonably make the order or determination in question. *Solie v. Employee Trust Funds Bd.,* 2005 WI 42, ¶ 23, 279 Wis. 2d 615, 695 N.W.2d 463 (citation omitted).

¶ 23. The issue presented in this review, whether a commercial driver who is disqualified by a carrier for a medical condition must seek a determination regard-

ing medical qualifications from the DOT under the DOT's dispute resolution before bringing a disability discrimination claim under the WFEA, involves statutory interpretation, a question of law this court ordinarily reviews de novo. *See DaimlerChrysler v. LIRC,* 2007 WI 15, ¶ 10, 299 Wis. 2d 1, 727 N.W.2d 311. However, this case involves review of an agency decision, and we often accord deference to an agency's legal conclusions. *Solie,* 279 Wis. 2d 615, ¶ 25. We apply one of three levels of deference to an agency's interpretation and application of law: great weight deference, due weight deference, or no deference, depending upon the "comparative institutional qualifications and capabilities of the court and the administrative agency." *Racine Harley-Davidson,* 292 Wis. 2d 549, ¶ 13.

¶ 24. Many of our prior cases reviewing LIRC's interpretation and application of the WFEA have applied great weight deference. *See, e.g., Hutchinson Tech., Inc. v. LIRC,* 2004 WI 90, ¶ 22, 273 Wis. 2d 394, 682 N.W.2d 343; *Crystal Lake Cheese Factory v. LIRC,* 2003 WI 106, ¶ 28, 264 Wis. 2d 200, 664 N.W.2d 651. However, we conclude that the agency's decision in this case is not entitled to any deference. As LIRC notes, the agency's view as to whether the WFEA should be interpreted to require a determination under federal law before an individual may pursue a claim under the WFEA concerns the scope of LIRC's own power and is therefore not binding on this court. *See Wis. Envtl. Decade v. Pub. Serv. Comm'n,* 81 Wis. 2d 344, 351, 260 N.W.2d 712 (1978) (citation omitted). Furthermore, to the extent that this case involves interpretation of federal commercial carrier regulations, we owe no deference to LIRC's decision because LIRC has no special

expertise interpreting and administering these regulations. *See DaimlerChrysler,* 299 Wis. 2d 1, ¶ 18.

## III

¶ 25. In a disability discrimination claim under the WFEA, the complainant must initially prove the following: (1) he or she has a disability within the meaning of the act; and (2) the employer's adverse employment action was on the basis of the complainant's disability.[10] *See Stoughton Trailers v. LIRC,* 2007 WI 105, ¶ 23, 303 Wis. 2d 514, 735 N.W.2d 477 (citation omitted). *See also* Wis. Stat. § 111.34(1). If the complainant meets its burden of proof as to both of these elements, the burden shifts to the employer to prove a defense under Wis. Stat. § 111.34. Under that section, the employer must show that its adverse action, while made on the basis of the complainant's disability, was not discriminatory under the WFEA. *Target Stores v. LIRC,* 217 Wis. 2d 1, 9, 576 N.W.2d 545 (Ct. App. 1998).

¶ 26. An employer may avoid a finding of discrimination by demonstrating that the person's disability renders him or her unqualified to adequately under-

---

[10] Wisconsin Stat. § 111.322(1) provides that it is an act of employment discrimination "to refuse to hire, employ, admit or license any individual, to bar or terminate from employment or labor organization membership any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment or labor organization membership because of any basis enumerated in s. 111.321." Wisconsin Stat. § 111.321 prohibits employment discrimination from an employer, labor organization, employment agency, licensing agency or other person on the basis of, among other reasons, disability.

take the responsibilities of the employment. Wis. Stat. § 111.34(2)(a).[11] "In evaluating whether an individual with a disability can adequately undertake the job-related responsibilities of a particular job, membership or licensed activity, the present and future safety of the individual, of the individual's coworkers and, if applicable, of the general public may be considered." § 111.34(2)(b). Such an evaluation must be made "on an individual case-by-case basis and may not be made by a general rule which prohibits the employment or licensure of individuals with disabilities in general or a particular class of individuals with disabilities." *Id.*

¶ 27. In this case, Midwest has not disputed that Wilson's disease is a disability within the meaning of the act, or that its decision to prohibit Szleszinski from driving equipment leased to Midwest was on the basis of Szleszinski's diagnosis of Wilson's disease. The only matter in dispute is whether Szleszinski was physically qualified to operate a commercial motor vehicle.

¶ 28. Federal DOT regulations address the minimum medical or physical qualifications for interstate commercial drivers, and where applicable, these regulations supersede any lesser state regulations. *See Frito-Lay, Inc. v. LIRC,* 95 Wis. 2d 395, 401, 290 N.W.2d 551 (Ct. App. 1980), *aff'd by an equally divided court,* 101

---

[11] Wisconsin Stat. § 111.34(2)(a) provides as follows:

Notwithstanding s. 111.322 [relating to prohibited discriminatory actions], it is not employment discrimination because of disability to refuse to hire, employ, admit or license any individual, to bar or terminate from employment, membership or licensure any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment if the disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment, membership or licensure.

Wis. 2d 169, 303 N.W.2d 668 (1981). Under the DOT regulations, a commercial truck driver engaged in interstate commerce must pass a medical examination demonstrating that he or she is physically qualified to be a commercial driver. *See* 49 C.F.R. § 391.41(a). Before concluding that a person is physically qualified to be an interstate commercial driver, the medical examiner must determine "that the driver does not have any physical, mental, or organic condition that might affect the driver's ability to operate a commercial motor vehicle safely." 49 C.F.R. § 391.43(f).[12] If the medical examiner concludes a driver is physically qualified, he or she must provide the driver and his or her employer with a copy of a certificate that so indicates. 49 C.F.R. § 391.43(g).

■■■

¶ 29. A driver must be re-examined at least every 24 months, and whenever the driver's "ability to perform his/her normal duties has been impaired by a physical or mental injury or disease." 49 C.F.R. § 391.45(b)(1) and (c). A driver carrying an otherwise valid medical examination certification may not drive if he or she becomes physically unqualified to do so. *See* 49 C.F.R. § 391.41(a). A carrier that allows a driver to operate a commercial motor vehicle after the driver becomes physically unqualified is in violation of federal law.[13] *See* 1 William E. Kenworthy, *Transportation Safety and Insurance Law* § 14.01 at 14–17 (3d ed. 2005).

---

[12] The federal regulations define a medical examiner as "a person who is licensed, certified and/or registered, in accordance with applicable State laws and regulations, to perform physical examinations." 49 C.F.R. § 390.5.

[13] As Midwest points out, federal statutes impose stiff penalties on employers who knowingly permit physically unqualified drivers to operate a commercial motor vehicle, including criminal prosecution, civil penalties and revocation of the

¶ 30. The DOT regulations enumerate several medical conditions for which a diagnosis results in automatic disqualification of a driver. For example, a driver with insulin-dependent diabetes, epilepsy (with some exceptions), or myocardial infarction may not be medically certified to operate a commercial motor vehicle. 49 C.F.R. § 391.41. Wilson's disease is not among the listed conditions for which diagnosis would preclude medical certification. The regulations provide detailed guidelines for the physician examiner conducting a medical evaluation of a driver. *See* 49 C.F.R. § 391.43.

¶ 31. The DOT regulations also contain an administrative procedure to resolve conflicts between two medical evaluations. 49 C.F.R. § 391.47. Either the carrier or driver may initiate the procedure by application to the DOT's Director of the Office of Bus and Truck Standards and Operations. 49 C.F.R. § 391.47(c), (d)(3). The regulation provides that "[a]pplications for determination of a driver's medical qualifications" must conform to certain requirements to be considered by the agency, including "proof that there is a disagreement between the physician for the driver and the physician for the motor carrier concerning the driver's qualifications." 49 C.F.R. § 391.47(b)(2).

¶ 32. Midwest contends that Szleszinski was required to seek a determination regarding his medical qualifications from the DOT under its dispute resolution procedure before filing his disability discrimination claim under the WFEA. Midwest asserts that because Szleszinski failed to seek such a determination from the DOT, his claim was properly dismissed by LIRC. Midwest and counsel for LIRC both complain that the court of

carrier's authorization to do business. *See* 49 U.S.C.A. § 13905(c); 49 U.S.C.A. § 521(b).

279

appeals' decision in this case will result in state hearing examiners, rather than federal regulators with expertise in interpreting the DOT regulations, deciding future disputes concerning medical qualifications of interstate commercial drivers.

¶ 33. We agree with Midwest and counsel for LIRC that DOT regulators should resolve disputes concerning medical qualifications of drivers that cannot be resolved by facial application of the DOT regulations. The DOT rules contain a procedure for the resolution of such disputes. *See* 49 C.F.R. § 391.47. As the federal agency charged with licensing and regulating interstate commercial drivers, the DOT has special expertise in resolving such disputes. By contrast, a state examiner hearing a WFEA complaint has no special expertise to resolve a technical dispute between two medical examiners concerning a driver's qualifications under the DOT regulations.

¶ 34. We therefore conclude that if, in the context of a WFEA proceeding, a determination regarding a driver's medical qualifications is necessary to resolve a dispute concerning such qualifications that cannot be resolved by facial application of the DOT regulations, the determination should be made by the DOT under its dispute resolution procedure. However, the fact that DOT regulators should resolve such disputes when they arise in the context of a WFEA claim does not mean that a determination of medical qualification must be made before a WFEA claim is filed, or that it is the driver's responsibility to seek such a determination.

¶ 35. The dispute in this case concerning Szleszinski's medical qualifications arises in the context of his disability discrimination claim under the WFEA.

280

Here, the DOT dispute resolution procedure is relevant to an issue that is material to a discrimination claim under the WFEA, i.e., whether Szleszinski was qualified to be an interstate commercial driver.

¶ 36. Under the WFEA, the employer carries the burden of proof on the issue of whether the complainant is qualified to adequately undertake the job-related responsibilities of the employment. Wis. Stat. § 111.34(2)(b). A showing by an employer that an individual is not qualified by reason of disability to execute the responsibilities of a particular job is a defense under the WFEA to the complainant's prima facie case of discrimination. *Id.* In this respect, the WFEA differs from the Americans with Disabilities Act (ADA), which requires that the employee, not the employer, shoulder the burden of proof on the question of whether the employee is qualified to perform the essential functions of a job. *See, e.g., Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 (7th Cir. 1996).

¶ 37. Accordingly, we conclude that when a dispute exists between the physician for the driver and the physician for the carrier regarding the driver's physical and medical qualifications, it is the carrier, not the driver, who bears the burden of seeking a determination under the DOT dispute resolution procedure if the carrier intends to offer a qualification-based defense against the driver's claim of disability discrimination under the WFEA.[14] A requirement that the driver seek

---

[14] The dissent suggests that our determination of who has the burden of going forward in this action somehow punishes Midwest. Dissent, ¶¶ 50, 66. To the contrary, we do not construe requiring a party to follow our statutes as punishment.

a DOT determination before filing a state discrimination claim would be contrary to the burden-shifting scheme of the WFEA. Moreover, such a requirement would prevent some drivers from filing legitimate WFEA claims before the statute of limitations has run.[15]

¶ 38. We find the analysis of the United States Court of Appeals for the Seventh Circuit in *Bay v. Cassens Transport Company,* 212 F.3d 969, 974–76 (7th Cir. 2000), to be instructive. In *Bay,* a former commercial truck driver brought a discrimination claim under the ADA after Cassens' physician decertified him for a diagnosis of profound sinus bradycardia with near loss of consciousness, a heart condition requiring decertification under the DOT regulations. *Id.* at 971–72. Bay did not seek recertification under the DOT dispute resolution procedure. *Id.* at 974. The *Bay* court con-

---

[15] We note that our conclusion differs in part from that of LIRC in *Hermann v. Ort Trucking Co.,* ERD No. 9301203 (LIRC, July 1, 1994). There, a trucking company's physician disqualified Hermann, a diabetic, because of high blood sugar levels, but Hermann's physician certified him to drive after concluding Hermann's blood sugar levels were acceptable. Hermann filed a claim for disability discrimination under the WFEA. LIRC dismissed Hermann's claim, holding that Hermann was required to seek a determination from the DOT under the dispute resolution procedure before filing a claim of disability discrimination under the WFEA.

At oral argument in the present case, counsel for LIRC expressed the view that *Hermann* was wrongly decided to the extent that the Commission should not have dismissed Hermann's claim outright, but should have stayed the proceedings to permit the DOT to resolve the medical qualification dispute. We agree with LIRC's counsel that the *Hermann* Commission should have sought a stay of the state proceedings to permit resolution of the medical qualification dispute by the DOT.

cluded that Bay's failure to seek recertification was fatal to his ADA claim based on the fact that, under the ADA, Bay carried the burden of showing that he was qualified to be a commercial driver. *Id.* at 973–74.

¶ 39. Thus, under *Bay,* the party that bears the burden of proof on the issue of whether the driver is qualified is the party that carries the burden of seeking a determination from the DOT regarding medical qualification. *See id.* at 973–74. In a case under the WFEA, that party is the employer. Accordingly, a carrier wishing to raise a defense based on the driver's medical qualifications must seek a determination from the DOT under the dispute resolution procedure when a legitimate dispute regarding the driver's qualifications exists between the driver's physician and the carrier's physician.

¶ 40. We note that in some cases it may be unnecessary to obtain a determination regarding the driver's medical qualifications from the DOT if the issue is easily resolved by facial application of the DOT regulations. For example, where the driver receives an undisputed diagnosis of a condition for which blanket disqualification of the driver is required under the regulations,[16] the hear-

---

[16] We note that provisions in the DOT regulations requiring automatic disqualification for diagnosis of certain conditions are valid for purposes of claims under the WFEA, despite the fact that the WFEA requires assessment of an individual's qualifications on a "case-by-case basis" and "not . . . by a general rule which prohibits the employment or licensure of . . . a particular class of individuals with disabilities." Wis. Stat. § 111.34(2)(b). The DOT's requirements prevail over lesser state provisions relating to the minimum qualifications of drivers. *Frito-Lay, Inc. v. LIRC,* 95 Wis. 2d 395, 401, 290 N.W.2d 551 (Ct. App. 1980), *aff'd by an equally divided court,* 101 Wis. 2d 169, 303 N.W.2d 668 (1981).

ing examiner may simply conclude that the driver is unqualified by facial application of the regulations.[17]

¶ 41. But where a dispute over a driver's medical qualifications cannot be resolved by facial application of the DOT regulations, the hearing examiner must either give the carrier the opportunity to seek a determination from the DOT regarding the driver's medical qualifications or seek sua sponte a determination from the DOT regarding the driver's medical qualifications. The hearing examiner should stay the WFEA proceedings pending the resolution by the DOT of the medical qualification dispute.

¶ 42. Because LIRC did not seek a determination from the DOT under its dispute resolution procedure, a remand directive from this court to LIRC to provide the carrier the opportunity to seek a determination from DOT would normally be in order. Under the unique facts of this case, however, a remand order is unnecessary because the DOT dispute resolution procedure is inapplicable. Under 49 C.F.R. § 391.47, a dispute must exist between a physician for the employer and a physician for the employee. In this case, the court of appeals concluded that Dr. Windhorst's medical evaluation was invalid under the DOT regulations, and Midwest did not seek review of this conclusion. Because the remaining two medical evaluations of Dr. Choucair and Dr. Skinner both concluded that Szleszinski was

---

[17] A hearing examiner may also be able to resolve a case without seeking a determination from the DOT where the driver can demonstrate that the employer's reliance on its doctor's medical determination was unreasonable or in bad faith. *See Bay v. Cassens Transp. Co.*, 212 F.3d 969, 975 n.2 (7th Cir. 2000).

qualified to drive, no dispute exists on review.[18] We have addressed the proper procedure for LIRC to apply in WFEA discrimination cases involving medical qualifications of interstate truck drivers to provide guidance in future cases.

¶ 43. We are sensitive to the importance of commercial driver standards in protecting the safety of the general public on the nation's highways. Our decision protects the safety of the general public because the DOT regulations provide that once an application is submitted concerning a driver's medical qualifications, the driver shall be deemed disqualified until such time

---

[18] Our analysis in reaching the conclusion that the DOT dispute resolution procedure was inapplicable in this case differs from that of the court of appeals. Before determining that Dr. Windhorst's examination was invalid under the DOT regulations, the court of appeals also concluded, as a threshold matter, that the DOT dispute resolution procedure was inapplicable because 49 C.F.R. § 391.47 applies only to disagreements between the physician for the carrier and the physician for the driver, and, in the view of the court of appeals, the disagreement in this case was between two physicians for the carrier (Dr. Windhorst and Dr. Choucair) only. *Szleszinski,* 287 Wis. 2d 775, ¶¶ 19–21. However, the court of appeals failed to note that an evaluation was also made by a physician for Szleszinski, Dr. Skinner. While Dr. Skinner's evaluation occurred one week after Midwest's employment decision and was therefore not available to Midwest at the time of its decision, Dr. Skinner's evaluation was still relevant to the issue of whether Szleszinski was medically qualified. Thus, a disagreement (in fact, if not in law) existed between a physician for the carrier (Dr. Windhorst) and a physician for the driver (Dr. Skinner). However, based on the court of appeals' conclusion not on review before us that Dr. Windhorst's evaluation was not valid, we conclude that no disagreement existed *in law* between a physician for the carrier and a physician for the driver.

as a determination is made or an order is issued. 49 C.F.R. § 391.47(f). In other words, once the DOT dispute resolution application is submitted, the person cannot drive a commercial motor vehicle until it has been determined that he or she is physically qualified to do so. *Compare* 49 C.F.R. 391.41(a) *with* 49 C.F.R. § 391.47(f). Our decision ensures that whenever a legitimate dispute regarding the medical qualifications of a driver arises in the context of a WFEA claim, it will be resolved in the same manner as would any such dispute—by resort to the proper federal authorities, with the driver being disqualified until a determination is made.[19]

¶ 44. Finally, we address the discussion of the doctrine of exhaustion of administrative remedies contained in the court of appeals' opinion. *Szleszinski,* 287 Wis. 2d 775, ¶¶ 17–18, 21. We do so to ensure that the law of exhaustion of administrative remedies does not become confused. *See Cook v. Cook,* 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) (stating that this court's primary function is that of law defining and law development).

¶ 45. One rationale for the court of appeals' conclusion that Szleszinski did not have to seek a determination of medical qualification from the DOT was because "the WFEA does not require individuals to exhaust other administrative remedies." *Szleszinski,* 287 Wis. 2d 775, ¶ 18. The court of appeals further

---

[19] The dissent asserts that this employment discrimination dispute involves the safety to the public. Dissent, ¶ 50. We agree. Our decision removes from the road drivers involved in disputes regarding their medical qualifications until their disputes are resolved. Thus, we fail to discern how this decision will "push or prod motor carriers into hiring commercial drivers who are unsafe at any speed." *See* dissent, ¶ 98.

suggested that exhaustion of administrative remedies is necessary only when the legislature expressly requires it. *See id.* ("The legislature has, when it deemed exhaustion appropriate, expressly required utilizations of administrative remedies prior to initiating circuit court action. *See, e.g.*, Wis. Stat. §§ 49.498(19)(a), 50.03(11)(a) and 801.02(7)(b).") We disagree.

¶ 46. Generally, the exhaustion of remedies doctrine arises in the context of whether a plaintiff exhausted its remedies in an administrative proceeding before filing a lawsuit. *See, e.g.*, *Wisconsin Collectors Ass'n, Inc. v. Thorp Finance Corp.*, 32 Wis. 2d 36, 47, 145 N.W.2d 33 (1966) ("[T]he exhaustion rule relates to judicial review of an *uncompleted* administrative proceedings . . . ."). Judicial interference is withheld until the administrative process has run its course. *Id.* (citation omitted). The context in which the court of appeals considered the exhaustion of remedies doctrine in this case, however, concerned whether a claimant involved in one administrative proceeding under the WFEA was required to exhaust his remedies in another administrative proceeding before bringing the WFEA claim.[20]

¶ 47. The court of appeals' suggestion that legislative authorization is necessary for the doctrine of exhaustion of administrative remedies to apply is simply incorrect. While it is true that exhaustion of remedies is mandated by statute in some cases, *see, e.g.*, Wis. Stat. §§ 49.498(19)(a), 50.03(11)(a), and 801.02(7)(b), the rule of exhaustion of administrative remedies is a "doctrine of

---

[20] Considering exhaustion of administrative remedies in this context raises the following question: If exhaustion of administrative remedies is required, which set of administrative remedies must be exhausted first?

judicial restraint" which developed in the common law and has been codified by the legislature in some settings. *See Nodell Inv. Corp. v. City of Glendale,* 78 Wis. 2d 416, 424, 254 N.W.2d 310 (1977); *see also State ex rel. Martin v. City of Juneau,* 238 Wis. 564, 568, 300 N.W. 187 (1941) ("[W]here a specified method of review is prescribed by an act creating a new right or conferring a new power, the method so prescribed is exclusive and if [judicial] review is sought that method must be pursued.). This court has frequently considered the doctrine of exhaustion of remedies in cases in which no statute mandated exhaustion. *See, e.g., State v. Wisconsin Employment Relations Comm'n,* 65 Wis. 2d 624, 635–37, 223 N.W.2d 543 (1974); *Jefferson County v. Timmel,* 261 Wis. 39, 63, 51 N.W.2d 518 (1952); *Ferch v. Schroedel,* 241 Wis. 457, 461, 6 N.W.2d 176 (1942).

IV

¶ 48. In sum, we conclude that a driver need not seek a determination of medical qualification from the DOT prior to filing a disability discrimination claim under the WFEA. We also conclude that when a person's medical and physical qualifications to be an interstate commercial driver are material to a WFEA claim, and a dispute arises concerning those qualifications that cannot be resolved by facial application of the DOT regulations, such a dispute should be resolved by the DOT under its dispute resolution procedure. We further conclude that, under the WFEA's burden-shifting scheme, the carrier, not the driver, is the party that must seek a determination of medical and physical qualification from the DOT if the carrier intends to offer a defense that the driver was not qualified for medical reasons.

288

¶ 49. With regard to the issue before us on review, we therefore reverse the decision of LIRC and reinstate the hearing examiner's decision. We remand to LIRC to grant the award ordered by the hearing examiner in this case.

*By the Court.*—The decision of the court of appeals is modified and, as modified, affirmed.

¶ 50. DAVID T. PROSSER, J. (*dissenting*). Most employment discrimination disputes do not involve the safety of the public. This one does. The effect of this case is to punish a trucking company that discontinued the services of an over-the-road commercial truck driver whom it believed posed an unreasonable risk on the highway. Although the court appears to decide the case on narrow procedural grounds, it fails to confront important issues that transcend this dispute and adversely affect the motor carrier industry and the public at large. Because these issues require discussion, I respectfully dissent.

## BACKGROUND

¶ 51. Leon P. Szleszinski (Szleszinski) was hired as a commercial truck driver by Transhield Leasing Company (Transhield) on or about June 21, 1995. Transhield leased trucks and drivers to Midwest Coast Transport (Midwest), a large trucking company headquartered in South Dakota. Midwest insisted on approving all drivers involved in its operations.

¶ 52. To obtain Midwest's approval to work, Szleszinski submitted to a physical examination in accordance with Federal Motor Carrier Safety Regulations. This examination was completed on June 20, 1995, by Dr. L.D. Carlson, in Bruce, Wisconsin. Szlesz-

inski acknowledged to Dr. Carlson and his prospective employers that he had Wilson's disease, an uncommon, progressive neurological disorder. Consequently, Midwest asked that additional medical records be sent to South Dakota for review by the independent Central Plains Clinic in Sioux Falls, which is part of Occupational Health Associates of South Dakota. A physician's assistant at the clinic, Pat Farritor, signed off on Szleszinski's application.

¶ 53. In March 1996, nine months later, Midwest received two separate complaints from the public about Szleszinski's driving. On March 8 a complainant from Watertown, Wisconsin, alleged that Szleszinski was "weaving all over his lane," then came into the complainant's lane forcing him onto the shoulder of Interstate Highway 94. The complainant said Szleszinski also was tailgating and laying on his horn. On March 12 a second complainant, from Bloomer, Wisconsin, claimed that Szleszinski was weaving in his lane and speeding on a highway near Eau Claire.

¶ 54. Midwest promptly suspended Szleszinski until it could determine whether Szleszinski could safely operate his 16–wheel vehicle. Midwest's safety director, Lou Rogers, made arrangements for Szleszinski to be examined by Dr. Ali Choucair, a neuro-oncologist at the Marshfield Clinic. Midwest had not worked with Dr. Choucair before.

¶ 55. Dr. Choucair examined and interviewed Szleszinski on March 15, 1996. Dr. Choucair's written report, dated March 19, reads in part:

> Mr. Szleszinski is a 36–year-old who is here for evaluation regarding his driving ability. He is referred by Dr. [Conrad] Eastwold, but actually his referral came from Mr. Lou Rogers, safety manager where Mr.

290

Szleszinski has been employed. However, Mr. Szleszinski does not want me to send any correspondence to Mr. Lou Rogers. . . . Mr. Szleszinski would like a copy of this evaluation *to go to the two gentlem[e]n noted below.* One of them, he tells me, is his supervisor and the other one is his attorney. He had been seeing Dr. Eastwold at Rice Lake for management of Wilson's disease.

The history as I have it was obtained in detail from the patient, who was also accompanied by his mother. *I have very scanty medical records from Dr. Eastwold.* The patient tells me that his diagnosis of Wilson's disease has been confirmed at the Mayo Clinic.

The reason all of this came about is, according to Mr. Lou Rogers, that the patient had been seen driving a 16 wheeler, swaying over the highway. The patient himself denies any difficulty whatsoever on the job.

. . . .

He tells me he was diagnosed as having Wilson's disease at age 17. He at that time was having a physical for joining the military. He was then referred to Dr. Harold Noran, a neurologist in Minneapolis, who saw him in July of 1981, and that is when the diagnosis was established. However, the patient tells me that he had been to the Mayo Clinic two years ago by referral from Dr. Eastwold, and I have lab follow-ups subsequently. . . . There are labs here for ceruloplasmin in June of 1990 which was 2 (normals being 20–45) and urine copper was high at 1024 (normals are 15–60). He also had his liver enzymes checked, with a total bilirubin of 1.37, with a normal AST and a ceruloplasmin in June of 1992 of 4, again well below normal.

The patient also has been known to have anxiety and an adjustment disorder for which he was once admitted in 1986.

The patient was given the neurology questionnaire to fill out, which was reviewed with him in great detail.

. . . .

EXAM: A 36–year-old man. . . . He weighs 216 pounds and is 69 inches tall. Visual acuity 20/25 and 20/40.

. . . .

*His detailed neurological examination is outlined on the neurological examination sheet, which is part of the permanent medical record.* He impresses me as being a very anxious gentleman. He is, however, very cooperative. He does have definite dysarthria and he has very mild masking of the face. He has very mild stooping of his gait. He does have diminished arm swing bilaterally. He has mild difficulty with tandem. He has Kayser-Fleischer rings on his funduscopic exam. He does have mild difficulty with finger-to-nose-to-nose. He also had very mild difficulty with heel-to-shin; again, this is really mild. He has symmetrical hyperreflexia, but the toes are bilaterally downgoing. He has no motor deficit on strength and a normal sensory exam in all detailed modalities. *The neurological exam is outlined on the neurological examination sheet, which is part of the permanent medical record.*

IMPRESSION: 1. Established diagnosis of Wilson's disease with very mild demonstrated deficit on the neurological examination.

PLAN & DISCUSSION: As I told Leon, as a physician, I take the complaints from his safety manager as very serious. I told him it is my responsibility to protect him as well as to protect others. I told him the report that he was seen swaying on the highway is of serious concern to me, especially when he is driving an almost 70 or 80 ton truck. I told him, by law, people who drive these vehicles need to demonstrate full ability of

292

control. *His deficit I do not believe is such that will prevent him from operating a motor vehicle. However, I am seeing him only on one instance. I have not had the opportunity to observe him.* I told him, however, it is my strong conviction that he should undergo an MRI scan of the head and that he should have formal detailed psychometrics done. *If he does well on these two, my next step would be to recommend that he have a road test by the DOT authorities.* This was explained to him in detail.

Even though he gave me permission to speak to Mr. Lou Rogers, he would not give me permission to release information to him.

. . . .

Created 3/19/1996 (emphasis added).

¶ 56. When it received Dr. Choucair's report, Midwest sent it to Central Plains Clinic for review by the Medical Director, Dana J. Windhorst, a medical doctor with a master's degree in public health. Dr. Windhorst's report, dated March 21, 1996, reads as follows:

I have reviewed Mr. Szleszinski's records, specifically the note from Ali Chou[c]air, M.D., Neurologist with St. Joseph's Hospital in Marshfield, Wisconsin. I also discussed the case with Pat Farritor, P.A.-C. As I understand it, Mr. Szleszinski has a 19–year history of Wilson's disease, with diagnosis confirmed at the Mayo Clinic. The laboratory tests on Dr. Chou[c]air's note was certainly consistent with Wilson's disease. As far as I can see, there is no question that this is the confirmed diagnosis, at least based on the information available to me.

The neurological examination did indicate some mild neurological deficits, specifically in the areas of coordination, and possibly some extrapyramidal problems as well.

In addition, there is the history, apparently twice, of this driver being observed to swerve on the highway suggesting some problem with functional coordination during his driving.

Wilson's disease is a progressive neurological disease, and this is of grave concern, given the responsibilities of driving large commercial vehicles on the highways. The Department of Transportation Conference on Neurological Disorder[s] and Commercial Drivers, dated July 1988, recommends, without exception, disqualification for individuals with confirmed diagnosis of Wilson's disease. Putting all this together, I cannot make a recommendation for this individual to be medically certified for DOT Licensure. It is also my opinion that regardless of the results of psychometric testing and MRI, that I would not change this recommendation.

¶ 57. The Conference report that was alluded to in Dr. Windhorst's letter reads in part as follows:

The Office of Motor Carriers (OMC), Federal Highway Administration (FHWA), U.S. Department of Transportation (DOT), sponsored a conference on April 7 and 8, 1988 to review the current standards for commercial motor vehicle drivers with neurological disorders. Conference participants numbered twenty-eight and included physicians and scientists experienced in the care of people with neurological disorders, and representatives from the motor carrier industry. The current standard (FHWA regulations, 49 C.F.R. [§] 391.41(b)(7, 8, 9) as established in 1971 and revised in 1983), permits qualification of individuals to drive a commercial vehicle if that person has no established medical history or clinical diagnosis of . . . any condition which is likely to cause loss of consciousness or the loss of ability to control a commercial vehicle, or . . .

294

neuromuscular . . . disease such that the condition interferes with his/her ability to safely control and operate a commercial vehicle.

The administrative rule applied to the commercial driver with neurological conditions was reviewed in light of the many advances in the diagnosis and care of neurological conditions that have accrued since 1971. Four major categories of neurological conditions were carefully reviewed by four task forces, discussed at a plenary session, and following integration of all information presented, further discussed in-depth by members of the Steering Committee.[1] The following summaries were prepared:

. . . .

*Executive Summary—Progressive Neurological Conditions*

The task force felt that the current medical examination for commercial driving certification was inadequate in assessing neurological conditions. . . . For progressive neurologic disorders we recommend two categories for disqualification. *The first category includes chronic diseases that would unequivocally indicate disqualification:*

- Dementia

- Motor neuron disease

- Malignant tumors of the central nervous system

- Huntington's disease

- *Wilson's disease*

---

[1] The four major categories in the report were: I. Static Neurological Conditions; II. Progressive Neurological Conditions; III. Episodic Neurological Conditions I; and IV. Episodic Neurological Conditions II.

TASK FORCE II REPORT: PROGRESSIVE NEURO-
LOGICAL CONDITIONS

. . . .

EXTRAPYRAMIDAL DISORDERS WITH HYPERKI-
NESIA.

A broad range of movement disorders are charac-
terized by excessive motor activity. Patterns of motor
activity include chorea, athetosis, dystonia, myoclonus
and tremor. Individually these disorders are rare but
collectively they are not infrequent. When mild, such
involuntary movements may not significantly impair
motor function but when severe, coordination may be
significantly impaired. These involuntary movements
are usually manifestations of diseases which in them-
selves may be disqualifying for commercial vehicle
operation. . . .

. . . .

*Disposition*

Due to the broad range of manifestations, the
marked variety in intensity of manifestations from one
individual to another, and the large number of diseases
of which these hyperkinesias may be symptomatic, it is
not possible to make a simple rule regarding disposi-
tion. Each case must be evaluated on the ability of the
individual to perform adequately in appropriate neuro-
logical tests to assess strength, dexterity and coordina-
tion. *A clear diagnosis of Huntington's disease or
Wilson's disease is unequivocal grounds for disqualifi-
cation.*

Conference on Neurological Disorders and Commercial
Drivers, U.S. Dep't of Trans., Fed. Highway Admin.
(July 1988) (emphasis added).

¶ 58. On March 26, 1996, Midwest formally terminated Szleszinski's qualification to drive equipment leased to Midwest.[2] Szleszinski immediately cancelled a scheduled MRI and additional examination with a doctor at the Marshfield Clinic. Instead, Szleszinski's attorney arranged for him to see a different doctor, Stanley A. Skinner, of the Minneapolis Clinic of Neurology. In April 1996 Dr. Skinner issued a report, which reads in part:

> I did see your patient, Leon Szleszinski, today for follow-up of Wilson's disease, and particularly with respect to the patient's ability to drive a truck, etc. This 36–year-old, right-handed, white male was diagnosed with Wilson's disease when he was about 17 years of age. At that time the patient had increased dysarthria and hand tremors that were progressive. He was found to have Kayser-Fleischer corneal rings and later was noted to have a maternal cousin who had been diagnosed with Wilson's disease in Chicago. Apparently blood and urine copper, ceruloplasmin and other data were obtained, which were all consistent with the diagnosis. The patient was placed on penicillamine four times a day and his symptoms really relented. He was told by his treating physician at the time that he had a very mild case. . . .
>
> The patient has driven a truck for 12 years. When he passed his truck driving examination, he passed for all varieties of trucks under different conditions. *Since that time he has had no truck driving accidents*[3] and no speeding tickets. He also works as a volunteer for the

---

[2] This action did not affect Szleszinski's ability to drive a commercial vehicle for a different company.

[3] Leon Szleszinski was involved in a fatal motor vehicle accident on March 15, 1995, in Maryland. There is no evidence that Szleszinski was at fault in the accident. On March 17, 1995, Szleszinski told a doctor at the Shell Lake Clinic that he was hit

local fire department. *The patient has no history of liver disease with respect to his Wilson's disease. . . .*

On examination this patient is awake, alert, attentive, with very mild dysarthria. He is pleasant, smiling, straightforward, and easy to develop a rapport with. He has no abnormalities of thought content of stream of thought. He is fluent. With his hands outstretched, the patient has almost no resting or postural tremor. Perhaps only very mild terminal dysmetria is seen with finger-nose-finger examination; this is questionable. He is good and strong in the four limbs. His ocular motility is normal. His visual fields are full. His facies are symmetrical. The tongue protrudes in the midline with a normal gag. The fundi are benign. The patient still has fairly striking Kayser-Fleischer corneal rings. The reflexes are 2/4 at the biceps, triceps, knees and ankles. The toes are downgoing. The station and gait are judged to be normal. The sensory examination to pinprick, light touch, position and vibration are normal in the four limbs.

IMPRESSION: Treated Wilson's disease.

. . . .

At this point, for the purpose of this examination and the patient's work status, I do not see that this diagnosis should have any influence whatsoever on the patient's occupation as a truck driver. *As far as I am concerned, Wilson's disease is treated extremely well, the*

---

by an oncoming car, his truck stopped when it hit a tree, he went to a hospital emergency room in Maryland, one of the occupants of the car was decapitated, and he wondered if the incident would haunt him for the rest of his life. Szleszinski went to a Wisconsin attorney to represent him for his injuries. Szleszinski's Maryland accident is inconsistent with a statement that Szleszinski had no truck driving accidents over a 12–year period.

*patient is almost asymptomatic and should function quite well in his occupation.* About once a year, I think the patient should have liver tests, but even that may be overly compulsive. Penicillamine may have side effects that can cause multiple weakness, a myasthenic type syndrome, or neuropathy, but I do not see any evidence of that at this time.

(Emphasis added.)

¶ 59. In October 1996 Szleszinski filed a disability discrimination complaint under the Wisconsin Fair Employment Act (WFEA). He alleged that Midwest unlawfully terminated his employment because of his physical disability (Wilson's disease). On September 15, 1997, an equal rights officer found probable cause to proceed. In 1998, after discovery, Szleszinski amended his complaint.

¶ 60. Szleszinski died on March 11, 1999, in Emlenton, Pennsylvania. He was 39. An autopsy was performed. The coroner's certificate of death listed "cirrhosis of liver" as a consequence of "Wilson's disease" as the cause of death. Thereafter, Szleszinski's estate was substituted as the complainant in Szleszinski's equal rights action.

¶ 61. Transhield, which had been brought into the case in the amended complaint, and Midwest moved to dismiss. After the case was held under advisement for more than 30 months, the hearing examiner rejected the motion to dismiss and scheduled an evidentiary hearing for July 16, 2002, more than three years after Szleszinski's death.

¶ 62. At that hearing, the examiner heard testimony from four witnesses and received multiple exhibits of medical and other records, including the reports from Drs. Carlson, Choucair, Windhorst, and Skinner. No medical doctors testified at the hearing. On August

299

7, 2003, almost 13 months after the hearing, the hearing examiner issued a decision and order supporting Szleszinski's claim. Among his findings of fact, the hearing examiner found:

 5. Dr. Windhorst did not examine Szleszinski. Dr. Windhorst opined that Szleszinski be disqualified from DOT licensure. *Dr. Windhorst based his opinion on Dr. Choucair's report as well as a Department of Transportation Conference on Neurological Disorder[s] and Commercial Drivers* which recommended that anyone with a confirmed diagnosis of Wilson's disease [be] disqualified from driving commercially.

 6. Based upon Dr. Windhorst's report [Midwest] disqualified Szleszinski as a driver on March 26, 1996. There being no other work available [Transhield] terminated Szleszinski's employment at the same time.

(Emphasis added.)

¶ 63. Among his conclusions of law, the examiner ruled that Midwest "discriminated against Szleszinski . . . when it terminated his employment because he was diagnosed with Wilson's disease." The hearing examiner's decision contained no discussion of his findings of fact or conclusions of law, but it noted that a transcript of the hearing was not prepared.

¶ 64. Midwest and Transhield petitioned the Labor and Industry Review Commission (LIRC) for review. On February 24, 2004, LIRC dismissed Szleszinski's complaint, concluding that he had failed to sustain his burden that he was terminated by respondents because of his disability. LIRC's decision was affirmed by the Washburn County Circuit Court, Eugene D. Harrington, Judge, but it was substantially

reversed by the court of appeals. *Estate of Szleszinski v. LIRC,* 2005 WI App 229, 287 Wis. 2d 775, 706 N.W.2d 345.

## DISCUSSION

¶ 65. The majority concludes that a person's medical and physical qualifications to be an interstate commercial truck driver are material to a claim under the WFEA. Majority op., ¶ 5. However, according to the majority, a driver need not seek a determination of medical qualification from the United States Department of Transportation (DOT) prior to filing a disability discrimination claim under the WFEA. In fact, under the WFEA's burden shifting scheme, the motor carrier, not the employee, must seek a determination from the DOT if the carrier intends to offer a defense that the driver was not qualified for medical reasons. *Id.*

¶ 66. LIRC came to a different conclusion on this issue, as it had in *Hermann v. Ort Trucking Co.,* ERD No. 9301203 (LIRC, Dec. 13, 1994).[4] In my view, LIRC's decision on this issue was correct. But even if it was not, this court should not punish Midwest for following the law as it existed from *Hermann* to the time of the Szleszinski hearing. After all, Midwest won the case before LIRC on the facts and the law.

---

[4] *Hermann v. Ort Trucking Co.,* ERD No. 9301203 (LIRC, Dec. 13, 1994), involved two conflicting medical reports. LIRC dismissed the employee's complaint, concluding that the employer "should not be held to have acted in violation of the Wisconsin Fair Employment Act unless and until there has been a determination under the federal safety regulations that the complainant is qualified to drive, and the [employer] refuses to permit him to drive."

¶ 67. In reviewing LIRC, the majority talks the talk, but it does not walk the walk. The opinion states: "When reviewing the decision of an administrative agency, this court reviews the agency's decision and not the decision of the court of appeals or the circuit court." Majority op., ¶ 22 (citing *Racine Harley-Davidson, Inc. v. Div. of Hearings & Appeals,* 2006 WI 86, ¶ 8 n.4, 292 Wis. 2d 549, 717 N.W.2d 184). This means, "we do not deal directly with the correctness of the court of appeals decision brought to us on review, nor do we give that decision any deference. We review the decision of the commission." *West Bend Co. v. LIRC,* 149 Wis. 2d 110, 117, 438 N.W.2d 823 (1989). Moreover, we do not disturb the *factual findings* of the agency if they are supported by credible and substantial evidence. *CBS, Inc. v. LIRC,* 219 Wis. 2d 564, 570, 579 N.W.2d 668 (1998). "Such findings of fact are conclusive if there is any credible evidence to support those findings." *West Bend,* 149 Wis. 2d at 117–18.

¶ 68. The majority opinion departs from these familiar principles of law by disregarding LIRC's complete and persuasive decision and memorandum opinion. LIRC made detailed findings of fact which show an impressive grasp of the entire record before the hearing examiner, including a newly prepared transcript of testimony. For instance, LIRC found the following:

> 1. Complainant was diagnosed with Wilson's Disease in 1981, when he was 22 years old. Wilson's disease, or hepatolenticular degeneration, is a disease marked by an increased output of copper in the urine, deposits of copper in the tissues, cirrhosis of the liver, pigmentation of the cornea, and degenerative changes in the central nervous system. Complainant's medical records state that, in July of 1980, he reported to his physician that he had some tremors in his hands, particularly after working in the woods. Complainant's

medical records state that, in August of 1981, he was observed to have some ataxia (lack or loss of muscular coordination resulting in irregularity of muscular movements), and posturing of his hands; to have experienced a significant drop in test results over the last two years compatible with decreased cerebral function; and was prescribed the medication Penicillamine to relieve certain of the symptoms of Wilson's disease. Complainant's medical records state, in May of 1986, that he was moderately mentally retarded secondary to Wilson's disease, and that he was on several medications, including some for treatment of psychiatric disorders. Complainant's medical records state that, in 1989, complainant's mother reported that he suffered from "fits" due to Wilson's disease. Complainant's medical records state that, in August of 1992, he complained that he could drive only 100 miles before becoming fatigued, he suffered from whole body weakness and was weaker than he was five years before, and he was having difficulty sleeping.

¶ 69. There is no detail of this sort in the hearing examiner's decision, in the court of appeals' decision, or in the majority's decision. When LIRC stated that "Complainant was diagnosed with Wilson's Disease in 1981, when he was 22 years old," it accurately summarized Szleszinski's early medical records which contradicted information that Szleszinski supplied to both Dr. Choucair and Dr. Skinner.

¶ 70. Another finding of fact is revealing:

6. As a result of these [complaints] and considering [Szleszinski's] diagnosis of Wilson's Disease, Jeffrey Gillespie, MCT's Vice President of Safety, required that complainant be medically evaluated. On March 13, 1996, complainant was examined by Dr. Carlson. The records of this visit state that complainant told Dr. Carlson that *the weaving was caused by brake problems*

303

*with his vehicle.* Dr. Carlson recommended the complainant be examined by a neurologist.

(Emphasis added.)

¶ 71. The statement about "brake problems" in the medical records appears to conflict with what Szleszinski told Dr. Choucair: "The patient himself denies any difficulty whatsoever on the job." It is also at odds with the court of appeals' statement: "Szleszinski did not remember either incident." *Szleszinski,* 287 Wis. 2d 775, ¶ 15.

¶ 72. More significant, however, is LIRC's memorandum opinion. The opinion quoted from Wis. Stat. § 111.34(2)(b) and (c).[5] It acknowledged Szleszinski's theory that Dr. Windhorst's opinion "was based exclu-

---

[5] Wisconsin Stat. § 111.34(2)(b) and (c) reads:

(b) In evaluating whether an individual with a disability can adequately undertake the job-related responsibilities of a particular job, membership or licensed activity, the present and future safety of the individual, of the individual's coworkers and, if applicable, of the general public may be considered. However, this evaluation shall be made on an individual case-by-case basis and may not be made by a general rule which prohibits the employment or licensure of individuals with disabilities in general or a particular class of individuals with disabilities.

(c) If the employment, membership or licensure involves a special duty of care for the safety of the general public, including but not limited to employment with a common carrier, this special duty of care may be considered in evaluating whether the employee or applicant can adequately undertake the job-related responsibilities of a particular job, membership or licensed activity. However, this evaluation shall be made on an individual case-by-case basis and may not be made by a general rule which prohibits the employment or licensure of individuals with disabilities in general or a particular class of individuals with disabilities.

sively on the 1988 [Office of Motor Carriers] conference report," and therefore "violated the requirement of 111.34(2)(b) and (c) that evaluations be made on a case-by-case basis." LIRC answered this "theory" and determined that:

> 1. "[A]n *individual assessment* of complainant's medical condition was conducted both by Dr. Choucair and by Dr. Windhorst."

> 2. "[C]ontrary to complainant's contention here, Dr. Windhorst did not rely exclusively on the 1988 OMC conference report in his assessment of complainant's medical qualification to drive. He specifically states in his letter to [Midwest] that he reviewed Dr. Choucair's report as well as the conference report, in reaching his conclusion."

(Emphasis added.)

¶ 73. These *factual* conclusions are amply supported by the record. Dr. Windhorst did not examine Szleszinski face-to-face. However, Dr. Windhorst not only read Dr. Choucair's evaluation of Szleszinski (after they had a face-to-face meeting), but also studied the "neurological examination sheet" that accompanied Dr. Choucair's report. We know this because Dr. Windhorst writes in his letter that the "neurological examination did indicate some mild neurological deficits, specifically in the areas of coordination." Dr. Windhorst discussed the case with Pat Farritor, the physician's assistant who approved Szleszinski in June 1995. The two may have had the medical records from both 1995 and 1996 for their discussion. Dr. Windhorst also pointed to the two driving complaints and linked them to Szleszinski's possible coordination deficits. Finally, Dr. Windhorst discussed the 1988 conference report that contained the unqualified recommendation that persons with a con-

firmed diagnosis of Wilson's disease not be approved. Based on the reports he had, Dr. Windhorst concluded that Szleszinski had a 19–year history of Wilson's disease, which is described in the conference report as a "progressive neurological" condition, meaning a condition that tends to become more severe over time. "Putting all this together," Dr. Windhorst made his recommendation.

¶ 74. LIRC's factual findings were reversed as a matter of law by the court of appeals:

> 1. "Szleszinski contends there is no *factual* or legal basis for LIRC's determination that Midwest had a valid safety defense . . . . We agree with Szleszinski." *Szleszinski,* 287 Wis. 2d 775, ¶ 1 (emphasis added).

> 2. "To receive federal approval as an interstate carrier, 49 C.F.R. § 391.43(a) states drivers' physicals 'shall be performed by a licensed medical examiner . . . .' The results of the exam are then to be recorded on an exam form like the one included in the code. 49 C.F.R. § 391.43(f). Both subsections, read together, imply drivers will have actual face-to-face contact with the doctor or other examiner. Thus, it appears that under the operative Code language, a paper review of the driver's history is insufficient. . . . *[W]e conclude Windhorst's 'opinion' is an insufficient report as a matter of law under the Code, which requires actual examination of the patient.* Windhorst's opinion was merely a conduit for application of a Department of Transportation conference report that never became a regulation." *Szleszinski,* 287 Wis. 2d 775, ¶¶ 33–34 (emphasis added).

> 3. "Windhorst's report is also insufficient under *the WFEA because the act requires a case-by-case assessment of each individual. Windhorst did not make an individualized determination about Szleszinski's ability to drive,* but recommended disqualification simply be-

cause the Department of Transportation report said that all Wilson's patients should be disqualified. . . . Windhorst had no plans to rely on individualized assessment of Szleszinski's abilities, when the Wilson's diagnosis was, in Windhorst's mind, determinative of the outcome." *Id.*, ¶ 35 (emphasis added).

4. "We reiterate . . . that the federal regulations require a physical examination—something Windhorst did not provide. His report . . . cannot be considered a valid basis for a determination of Szleszinski's fitness to drive." *Id.*, ¶ 36.

5. "Because Windhorst's evaluation is invalid as a matter of law, it should not have been considered by Midwest in its qualification determination or by LIRC at the hearing. Thus, there is no credible evidence to support the determination that Szleszinski was unfit to drive." *Id.*, ¶ 38.

¶ 75. There is no way to hide the fact that the majority opinion is ratifying these extreme and, I believe, mistaken, holdings of the court of appeals. First, the court of appeals' decision is published[6] and thus is binding on the court of appeals, the circuit court, and LIRC. *See Cook v. Cook*, 208 Wis. 2d 166, 560 N.W.2d 246 (1997). Second, the majority repeatedly references the court of appeals' opinion on these holdings. *See* majority op., ¶¶ 3, 20, 41, and 42 n.18. Third, the majority specifically relies on the court of appeals' invalidation of Dr. Windhorst's opinion to deny relief to Midwest. *See* majority op., ¶ 42. Fourth, the majority opinion takes issue with the court of appeals' opinion on several points, but it does not take issue with these holdings. Fifth, the decision of the court of appeals is

---

[6] *Estate of Szleszinski v. LIRC*, 2005 WI App 229, 287 Wis. 2d 775, 706 N.W.2d 345.

modified and affirmed, but it is not modified on these mistaken holdings. In short, these mistaken rulings stand. They will appear as official interpretations of both Wisconsin law and federal regulation.[7]

¶ 76. These mistaken holdings stand because the majority pretends they are not part of this case. On the contrary, they are at the center of this case.

¶ 77. If, in fact, the majority is reviewing the decision of the administrative agency—LIRC—it needs to explain why it *never addresses any finding of fact or conclusion of law that LIRC made before it dismissed Szleszinski's complaint.* LIRC did not dismiss Szleszinski's complaint because he did not seek a determination of medical qualification from DOT prior to filing a disability discrimination claim.[8] It dismissed his complaint because, based on *all* the evidence presented at the July 16, 2002, evidentiary hearing, Szleszinski failed to prove his discrimination claim. As LIRC fully explained, it is not a violation of WFEA to take an employment action based on an individual's disability if his disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment. Wis. Stat.

---

[7] The court of appeals decision in *Szleszinski* is presently cited in the 2005–06 Wisconsin Statutes under Wis. Stat. § 111.321; *Equal Rights Decision Digest 2006* § 123.45, at 111 (State of Wis., DWD 2006); Rose Ann Wasserman, *Wisconsin Employment Law* § 14–10 (Supp. 2007); 29 *Mental and Physical Disability Law Reporter* 810, 913 (Nov./Dec. 2005).

[8] Szleszinski's brief in the court of appeals states: "[T]he Commission did not base its decision on the fact that Mr. Szleszinski did not utilize the appeal mechanism set forth in the DOT regulations whereby disputed DOT medical certifications can be reviewed."

§ 111.34(2)(a). Szleszinski failed to persuade LIRC that Midwest had not proved this defense.

¶ 78. In its decision, LIRC interpreted and applied Wis. Stat. § 111.34(2)(b) and (c). These paragraphs were created by § 17, ch. 334, Laws of 1981. They have been in effect since August 4, 1982. They are a critical component of the WFEA. Consequently, these paragraphs had been subject to LIRC's decision-making and oversight for more than 20 years when they were interpreted in Szleszinski's case in 2004. LIRC should have been given great weight deference for its legal interpretation of Wis. Stat. § 111.34(2)(b) and (c). *See UFE, Inc. v. LIRC,* 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996). Its findings of fact under these paragraphs are conclusive if there is any credible evidence to support them. *West Bend,* 149 Wis. 2d at 117–18.

¶ 79. The first issue with respect to Wis. Stat. § 111.34(2)(b) is the meaning of the words "this evaluation shall be made on an individual case-by-case basis." LIRC concluded that Dr. Windhorst had made an individual assessment of Szleszinski's medical condition under the statute. The court of appeals held that "Windhorst did not make an individualized determination about Szleszinski's ability to drive." *Szleszinski,* 287 Wis. 2d 775, ¶ 35. Inasmuch as Dr. Windhorst (1) looked at some of Szleszinski's medical records, including evaluations and tests; (2) discussed his case with another professional; (3) considered recent complaints about Szleszinski's driving; and (4) cited a widely known professional report which dealt specifically with Wilson's disease, the court of appeals must have meant that Dr. Windhorst could not have a valid opinion unless he conducted a physical examination of Szleszinski face-to-face. If this is the rule after this case, it will disqualify the expert opinion of all medical professionals who form

opinions based on the examination of a person's medical records. This cannot be the law.

¶ 80. The second issue with respect to Wis. Stat. § 111.34(2)(b) concerns the phrase "may not be made by a general rule which prohibits the employment or licensure of individuals with disabilities in general or a particular class of individuals with disabilities." LIRC determined that "Dr. Windhorst did not rely exclusively on the 1988 OMC conference report in his assessment." Conversely, the court of appeals determined that Dr. Windhorst "recommended disqualification simply because the Department of Transportation report said that all Wilson's patients should be disqualified." *Szleszinski,* 287 Wis. 2d 775, ¶ 35. Those opposing positions constitute a dispute over *fact,* and LIRC should win that dispute unless its determination is not supported by substantial and credible evidence. It is.

¶ 81. Several observations should be made about the relationship between 49 C.F.R. § 391.41 (Physical qualifications for drivers) and Wis. Stat. § 111.34. The federal regulation has several categorical exclusions. For instance, a person is physically qualified to drive a commercial motor vehicle *if* that person:

> (3) Has no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control;

> (4) Has no current clinical diagnosis of myocardial infarction, angina pectoris, coronary insufficiency, thrombosis, or any other cardiovascular disease of a variety known to be accompanied by syncope, dyspnea, collapse, or congestive heart failure;

> . . . .

> (8) Has no established medical history or clinical diagnosis of epilepsy or any other condition which is

310

likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle;

. . . .

(13) Has no clinical diagnosis of alcoholism.

49 C.F.R. § 391.41.

¶ 82. The federal rule thus conflicts with Wis. Stat. § 111.34(2)(b) and (c), which prohibit the evaluation of a person for employment on the basis of a rule prohibiting the employment of "a particular class of individuals with disabilities." There can be no dispute, however, that our statute cannot supersede the federal rule with respect to the regulation of persons who drive commercial motor vehicles and must have a valid commercial driver's license.

¶ 83. In fact, however, Wis. Stat. § 111.34(2)(c) specifically states: "If the employment . . . or licensure involves a special duty of care for the safety of the general public, including but not limited to employment with a common carrier, this special duty of care may be considered in evaluating whether the employee or applicant can adequately undertake the job-related responsibilities of a particular job." Dr. Windhorst made this very point in his letter when he wrote: "Wilson's disease is a progressive neurological disease, and this is of grave concern, *given the responsibilities of driving large commercial vehicles on the highways.*" (Emphasis added.) Szleszinski was driving a 70–80 ton truck across the country; he was not working behind a desk.

¶ 84. The report of the 1988 Conference on Neurological Disorders and Commercial Drivers is nearly 50 pages in length. It was not officially adopted and incorporated into federal rules. The report states that, "The contents do not necessarily reflect the official

311

policy of the Department of Transportation." However, the report was published by the Federal Highway Administration. It is included in the appendix to William E. Kenworthy, 1 *Transportation Safety and Insurance Law* § 14.01(10) (2007). Kenworthy writes as follows:

> DOT has issued several interpretive rulings delving in greater detail into the medical criteria for driving a CMV. In addition, the FMCSA has held conferences at which specialists in certain medical fields were invited to develop criteria for use by medical examiners for evaluating these criteria. So far, Conference Reports have covered the fields of cardiology, neurology, psychiatry, and respiratory disorders. The Conference Reports were condensed for distribution to medical examiners who provide physicals for drivers. The condensed texts, not published elsewhere, are reproduced in Appendix T (Medical Guidelines) to this Publication.
>
> To the author's knowledge, *both DOT interpretive rulings and the Conference Reports are being enforced by FMCSA field agents, despite their unpublished and unofficial status.* Drivers have been pulled off the road and disqualified despite holding a current medical certificate. Because these materials have never been adopted pursuant to a formal rule making conforming to the Administrative Procedures Act, they have only such legal weight as a court may find reasonable and persuasive as interpretive rules.

Kenworthy, *supra,* at § 14.01(10).

¶ 85. In *Tate v. Farmland Industries, Inc.,* 268 F.3d 989, 994 (10th Cir. 2001), the Court of Appeals observed that:

> DOT's Medical Advisory Criteria are prefaced with a note indicating they are only advisory and nonbinding. Nevertheless, the views of an agency such as DOT

312

implementing a regulatory scheme designed to ensure the safety of our nation's highways " 'constitute a body of experience and informed judgment' " to which employers may properly resort for guidance.

*Id.* (quoting *United States v. Mead Corp.,* 533 U.S. 218, 234 (2001)).

¶ 86. The same principle applies to the Conference Report. It represents a body of experience and informed judgment among neurologists that should not be ignored. Wilson's disease appears to affect a fairly small number of people. Wilson's disease is a rare disorder, occurring at a rate of approximately 30 cases per million births, or a birth incidence rate of about 1 per 30,000 to 40,000 births. *See* Ronald F. Pfeiffer, M.D., *Wilson's Disease, in* 27 *Seminars in Neurology* 2, 123 (2007). One doctor estimates that there are only 600 cases of the disease in the United States. *Id.* It is not surprising that there is no subsection in the Code of Federal Regulations for persons with Wilson's disease who apply for commercial motor vehicle permits.

¶ 87. The court of appeals also holds that a doctor or other examiner *must* have face-to-face contact with an applicant to have a valid opinion about the person's qualification to drive a commercial motor vehicle. This is clearly a matter of federal law. More important, however, the court of appeals takes this proposition and applies it out of context. A medical examiner who issues a certificate that a driver is medically qualified to drive a commercial vehicle may very well be required to conduct a face-to-face examination. However, a doctor who recommends that a person not be approved to operate a commercial motor vehicle for a particular employer, may be able to make that determination on the basis of medical records. For example, if an applicant's medical records show that the applicant has

313

a categorically disqualifying medical condition, no useful purpose would be served by a personal examination.

¶ 88. In my view, if we applied the familiar standards of review, we would affirm the decision of LIRC, and this case would be over.

¶ 89. The majority opinion operates in a different universe: It ostensibly concerns itself with the narrow issue of which party must seek a determination from the DOT about the medical qualification of a person who wishes to drive a commercial motor vehicle. As Szleszinski concedes, this is not the basis on which LIRC made its decision.

¶ 90. The majority's ruling requires careful examination.

¶ 91. Wisconsin Stat. § 111.322 provides that it is an act of employment discrimination: "(1) To refuse to hire, employ, admit or license any individual, to bar or terminate from employment . . . any individual . . . because of any basis enumerated in s. 111.321." Wisconsin Stat. § 111.321 includes "disability" as a prohibited basis for any act of employment discrimination. However, "it is not employment discrimination because of disability to refuse to hire, employ, admit or license any individual . . . or terminate from employment . . . any individual . . . if the disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment." Wis. Stat. § 111.34(2)(a). "The employer bears the burden to prove this defense to a handicap discrimination claim provided the complainant first establishes that the condition at issue is a handicap within the meaning of sec. 111.32(8) Stats., and that the employer discriminated on the basis of that handicap." *Racine Unified Sch. Dist. v. LIRC,* 164 Wis. 2d 567, 594, 476 N.W.2d 707 (Ct. App. 1991).

314

¶ 92. An aggrieved person has 300 days after the alleged discrimination to file a complaint with the Equal Rights Division of the Department of Workforce Development. Wis. Stat. § 111.39(1).[9] The complaint is then reviewed. Wis. Stat. § 111.39(4)(b). If the Department finds probable cause, the Department may serve a notice of hearing before one of its examiners, and then a hearing may be held. *Id.*

¶ 93. Considering that a truck driver who claims discrimination must show probable cause before obtaining a WFEA hearing and presumably would like a job in the meantime, it makes perfect sense for the employee to speed up the process and bolster his own case by applying to the DOT under 49 C.F.R. § 391.47 for a determination. Sooner or later, the employee must obtain a medical examiner's certificate and a high quality medical evaluation of the employee's medical status if the employee hopes to win his case.

¶ 94. An employer would have no reason to utilize the DOT procedure until the employer knew a person's medical qualification was at issue. This could take 300 days in Wisconsin. The employer could not use the DOT procedure until the employer could show that "there is a disagreement between the physician for the driver and the physician for the motor carrier concerning the driver's qualifications." 49 C.F.R. § 391.47(2). Thus, an employee who withholds a conflicting medical report precludes the employer's ability to use the DOT procedure. In any event, absolutely nothing in Wisconsin law

---

[9] "A complaint which is deferred to the department by a federal or local employment agency with which the department has a worksharing agreement complies with the requirements of sub. (3) and is considered filed when received by the federal or local agency." Wis. Admin. Code § DWD 218.03(5) (Nov., 2006).

*requires* an employer to prove his defense to a charge of disability discrimination by going to the DOT. Conflicting evaluations by two physicians would not begin to tell the DOT about Leon Szleszinski's lengthy medical history, which was obtained prior to the WFEA hearing through traditional discovery.

¶ 95. In *Hermann v. Ort Trucking Co.,* ERD No. 9301203 (LIRC, Dec. 13, 1994), LIRC said:

> [I]n view of the fact that the complainant's qualification to drive is governed by the Federal Motor Carrier Safety Regulations, and such regulations provide for resolution of disputes over conflicting medical evaluations[,] . . . the respondent should not be held to have acted in violation of the Wisconsin Fair Employment Act unless and until there has been a determination under the federal safety regulations that the complainant is qualified to drive, and the respondent refuses to permit him to drive.

¶ 96. Placing the burden on the employee or prospective employee makes good sense and follows the law in federal Americans With Disabilities Act cases. *Harris v. P.A.M. Transp., Inc.,* 339 F.3d 635, 638 (8th Cir. 2003); *Campbell v. Fed. Express Corp.,* 918 F. Supp. 912, 918 (D. Md. 1996).

¶ 97. If a case proceeds to a hearing, the burden of proving a defense falls to the employer. But in some circumstances, the case should never proceed to a hearing because (1) the employee has no case; or (2) the employee has shown a good case and the employer has responded favorably. The majority's rule does not require an employee to exhaust his administrative remedies; it forces the employer to exhaust an administrative procedure that it may not need.

¶ 98. There is often a shortage of drivers in the motor carrier industry. This decision may push or prod motor carriers into hiring commercial drivers who are unsafe at any speed.

¶ 99. For the reasons stated, I respectfully dissent.

¶ 100. I am authorized to state that Justice JON P. WILCOX and Justice PATIENCE DRAKE ROGGENSACK join this dissent.